### In re MILESTONE SCIENTIFIC SECURITIES LITIGATION.

No. Civ.A. 98–3404(AJL).

United States District Court, D. New Jersey.

May 31, 2000.

426

428

Arthur N. Abbey, Jill S. Abrams, Joshua Lifshitz, Abbey, Gardy & Squitieri, LLP, New York City, for plaintiffs Robert M. Gintel, et al., and Vivian Bollag, et al.

Andrew N. Friedman, Mark S. Willis, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., for plaintiffs Dr. Alan Shaw and John Wanda.

Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Seattle, WA, for plaintiff John Wanda.

Allyn Z. Lite, Joseph J. DePalma, Lite DePalma Greenberg & Rivas, LLC, Newark, NJ, for plaintiffs John Wanda, Jeffrey Grau Ira, Candice Zipes, Ram Yariv, Anne D. Shapiro, Nancy Canella, et al.

Peter S. Pearlman, Cohn Lifland Pearlman Herrman & Knopf LLP, Saddle Brook, NJ, for plaintiffs Laverne Catanzarite and Alexander Weingarten, et al.

Stephen D. Oestreich, Robert C. Finkel, Wolf Popper LLP, New York City, for plaintiff Laverne Catanzarite.

Richard D. Bemporad, David C. Harrison, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for Laverne Catanzarite and Alexander Weingarten, et al.

Klari Neuwelt, Law Office of Klari Neuwelt, New York City, for plaintiffs Alexander Weingarten, et al.

James V. Bashian, Law Offices of James V. Bashian, P.C., Fairfield, NJ, for plaintiffs Vivian Bollag, et al.

Joel P. Laitman, Schoengold & Sporn, P.C., New York City, for plaintiffs Candice Zipes, et al.

Leonard Barrack, Daniel E. Bacine, Gerald Rodos, Barrack, Rodos & Bacine, Philadelphia, PA, for plaintiffs John Johnson, et al.

Samuel R. Simon, Robert A. Hoffman, Barrack, Rodos & Bacine, Haddonfield, NJ, for plaintiffs John Johnson, et al.

Jonathan M. Plasse, Emily C. Komlossy, Catherine A. Murphy, Goodkind Labaton Rudoff & Surachow, LLP, New York City, for plaintiffs Ram Yariv, et al.

Kenneth Elan, Joseph Garland, Law Offices of Kenneth Elan, New York City, for plaintiffs Ram Yariv, et al.

Peter L. Masnik, Kalikman & Masnik, Haddonfield, NJ, for plaintiffs John E. Houx, et al.

Sherrie Savett, Jacob A. Goldberg, Berger & Montague, P.C., Philadelphia, PA, Bruce Murphy, Vero Beach, FL, Neil Rothstein, David R. Scott, Scott & Scott, LLC, Philadelphia, PA, for plaintiffs John E. Houx, et al.

Burton H. Finkelstein, Donald J. Enright, Finkelstein, Thompson & Loughran, Washington, D.C., for plaintiffs Nancy Cannella, et al.

Marc I. Gross, Daniel R. Wotman, Pomerantz Haudek Block & Grossman, New York City, David Jaroslawicz, Jaroslawicz & Jaros, New York City, for plaintiffs Anne D. Shapiro, et al.

Miles M. Tepper, Law Offices of Miles M. Tepper, West Orange, NJ, Jeffrey H. Squire, Joanne M. Cicala, Kaufman, Malchman, Kirby & Squire, New York City, for plaintiffs Joseph Shultz, et al.

Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, Chestnut Ridge, New York, Jules Brody, Howard T. Longman, Aaron L. Brody, Tzivia Brody, Stull, Stull & Brody, New York City, for plaintiffs Neil Chernichaw, et al.

Steven M. Gellerstein, Gellerstein & Saul, Teaneck, NJ, Brian P. Murray, Rabin & Peckel LLP, New York City, Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, for plaintiff Frank Nesbit, III.

Joseph P. LaSalla, McElroy, Deutsch & Mulvaney, Morristown, NJ, for plaintiffs Michael Trokel, et al.

Julie L. Friedberg, Berlack Israels & Liberman LLP, Morristown, NJ, Martin S. Siegel, John P. Biederman, Berlack Israels & Liberman LLP, for all defendants.

## OPINION

LECHNER, District Judge.

This is a consolidated class action [1] for securities fraud brought by designated lead class plaintiffs, Robert M. Gintel, *et al.,* (the "Gintel Group") [2] on behalf of all persons who purchased, or otherwise acquired Milestone Scientific, Inc. ("Milestone") common stock (collectively, the "Plaintiffs") during the period running from 31 March 1997 to 4 June 1998 (the "Class Period").

The two count consolidated amended complaint (the "Amended Complaint") alleges violations of Section 10(b) ("Section 10(b)") and Section 20(a) ("Section 20(a)") of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 ("Rule 10–b") promulgated thereunder, 17 C.F.R. § 240.10b–5. *See* Amended Complaint ¶¶ 96–110, Counts 1–2. Federal question jurisdiction, pursuant to 28 U.S.C. § 1331 ("Section 1331"), is alleged based upon Section 27 of the Exchange Act, as amended 15 U.S.C. § 78aa. *See id.* at ¶ 1.

Currently pending is a motion brought by Milestone to dismiss (the "Motion to Dismiss") the Amended Complaint for failure to state a claim, pursuant to Rule 9(b) ("Rule 9(b)") and Rule 12(b)(6) ("Rule 12(b)(6)") of the Federal Rules of Civil Procedure.[3] For the reasons set forth below, the Motion to Dismiss is granted.

---

**1.** Plaintiffs seek to represent a class of securities purchasers. The class, however, has not been certified.

**2.** By order, dated 22 October 1998, (the "22 October 1998 Order") the Gintel Group was appointed lead plaintiffs. *See* 22 October 1998 Order.

**3.** In support of the Motion to Dismiss, Milestone submitted: a memorandum of law in support of motion to dismiss consolidated and

The thirty-eight page, 110 paragraph Amended Complaint bases the cause of action on a series of published reports, news articles and filings with the Securities and Exchange Commission (the "SEC"). At issue are the contents of several statements, including four SEC filings, an annual report, sixteen Articles in Business Wire, two articles in Bloomberg News, and several trade magazines, as well as two telephone conference calls in May and June 1998.

Significantly, counsel for Plaintiffs conceded at oral argument that none of the statements quoted in the Amended Complaint from Paragraph 22 through Paragraph 99 were false or contained false data.[4]

The main thrust of the Amended Complaint appears to be the failure to adequately disclose that options were granted to certain consultants who performed tests or authored articles concerning a product manufactured by Milestone. Therefore, Plaintiffs argue that such articles were misleading. Plaintiffs contend that while such tests were reliable, they were, nevertheless, used to "hype" the stock of Milestone. As will be developed in a seriatim review of the Amended Complaint, in not one instance did counsel for Plaintiff contend during oral argument that any portion of the articles or tests quoted in the Amended Complaint was false. It appears all of the financial data included in the

SEC filings or otherwise made public, as referred to in the Amended Complaint, are accurate. The only possible exception to this is the argument made by counsel for Plaintiff that the reserves for returned sales, and therefore revenue recognition, were inadequate. In addition, an argument is offered that information disclosed about backlog was also inaccurate. Nevertheless, the Plaintiffs allege nothing in the Amended Complaint to attach a fraud component to these allegations, if in fact they are correct.

Upon review of the Amended Complaint, it appears the Plaintiffs allege the failure to disclose options payments to certain consultants and violations of the generally accepted accounting principles ("GAAP") governing financial reporting in an effort to support their securities fraud claims. *See generally* Amended Complaint at ¶¶ 21–89. In sum, upon a review of the Amended Complaint and a full text review of the statements at issue, it appears a negative news article released near the end of the Class Period precipitated a sharp decline in the price of Milestone stock.

*Facts*[5]

### A. The Parties

#### 1. Milestone

Milestone is a Delaware corporation with its principal place of business located

---

amended class action complaint (the "Moving Brief"), affidavit of Martin S. Siegel, Esq. (the "Siegel Aff."), and a reply memorandum of law in support of motion to dismiss class action complaint (the "Reply Brief").

In opposition to the Motion to Dismiss, the Plaintiffs submitted: plaintiffs'· opposition to defendants' motion to dismiss consolidated and amended class action complaint (the "Opposition Brief"), and an affidavit of Jill S. Abrams, Esq. in opposition to Defendants' motion to dismiss.

The Defendants also submitted a supplemental memorandum of law in support of the Motion to Dismiss class action complaint, and a reply supplemental memorandum of law in support of the Motion to Dismiss class action complaint. The Plaintiffs similarly submitted

a supplemental brief regarding paragraph 89 of the consolidated and amended class action complaint, a reply supplemental brief regarding paragraph 89 of the consolidated and amended class action complaint, and an affidavit of Jill S. Abrams in support of Plaintiffs' supplemental reply brief regarding paragraph 89 of the Complaint.

4. Counsel for plaintiff did argue, however, that paragraph 65 did contain false data. However, when pressed, counsel could not demonstrate what those false data were identified in the Amended Complaint. *See* 2 March 2000 Tr. at 44–82.

5. Each of the allegations in the Amended Complaint is accepted as true when determining the Motion for Judgment on the Plead-

in 44 Kean Road, Short Hills, New Jersey. *See* Amended Complaint at ¶ 6. Milestone develops, manufactures, markets, and sells equipment and related disposable or consumable devices and other related products for use by dental practitioners. *See id.* The principal product of Milestone is the wand (the "Wand"). The Wand is a computer controlled "painless" injection system which enables a dental practitioner to more quickly and effectively deliver anesthesia to patients in certain dental applications. *See id.* The Wand uses a disposable needle.

Milestone initially introduced the Wand during the fall 1997 American Dental Association (the "ADA") Trade Show. *See id.* As a result of a favorable response at the ADA trade show, Milestone began selling units of the Wand and an initial supply of 100 disposable needle devices to distributors in or about January 1998. *See id.*

On or about 1 March 1998, Milestone had more than 8.7 million shares of common stock outstanding. *See id.* Initially, the common stock was publicly traded on the NASDAQ National Market under the symbol "WAND" from 7 January 1998, until 22 April 1998. *See id.* at ¶¶ 6 & 50. On or about 23 April 1998 the common stock of Milestone began trading on the American Stock Exchange under the symbol "MS." *See id.* at ¶¶ 6 & 62.

### 2. *The Officer and, or, Director Defendants*

Leonard Osser ("Osser") was, at all times relevant to the Class Period, Chairman of the Board of Directors and Chief Executive Officer of Milestone beginning approximately July 1991. *See id.* at ¶ 7. In addition, Osser was the Chief Financial Officer of Milestone until July 1997. *See*

*id.* Osser was also the President of Milestone until 4 March 1998. *See id.*

Osser signed the annual reports on Securities and Exchange Commission (the "SEC") Form 10–K for the fiscal year ended 31 December 1996 (the "31 December 1996 SEC Form 10–K") and 31 December 1997 (the "31 December 1997 SEC Form 10–K"). *See id.* In addition, Osser signed SEC Form 10–Q for the fiscal quarters ended 31 March 1997 (the "31 March 1997 SEC Form 10–Q"), 30 June 1997 (the "30 June 1997 SEC Form 10–Q"), 30 September 1997 (the "30 September 1997 SEC Form 10–Q") and 31 March 1998 (the "31 March 1998 SEC Form 10–Q"). *See id.*

Pat Mele, III ("Mele") served as the Chief Financial Officer of Milestone between July 1997 and 3 April 1998, and allegedly resigned thereafter for personal reasons. *See id.* at ¶ 8. As the principal financial and accounting officer, Mele was responsible for the financial, treasury, and accounting functions of Milestone. *See id.* Mele singed the Milestone yearly report appended to the 31 December 1997 SEC Form 10–K. *See id.* Mele also signed the 30 September 1997 SEC Form 10–Q. *See id.*

Daniel R. Martin ("Martin") [6] became the president, Chief Operating Officer and director of Milestone beginning 4 March 1998. *See id.* at ¶ 9. In addition, Martin was the acting Chief Financial Officer of Milestone from 4 April 1998 until 4 May 1998. *See id.* On or about 6 January 1999, Martin took a leave of absence to address certain medical conditions. Martin signed the 31 March 1998 SEC Form 10–Q. *See id.*

---

ings; and all reasonable inferences are drawn in favor of the Plaintiffs. *See Taj Mahal Travel Inc. v. Delta Airlines Inc.,* 164 F.3d 186, 188 (3d Cir.1998) (citing *Turbe v. Gov't of the V.I.,* 938 F.2d 427, 428 (3d Cir.1991)). *See also Hayes v. Community Gen. Osteopathic Hosp.,* 940 F.2d 54, 56 (3d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992); *Institute for Scientific*

*Information, Inc. v. Gordon and Breach, Science Publishers, Inc.,* 931 F.2d 1002, 1004 (3d Cir.), *cert. denied,* 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991) (citing *Society Hill Civic Ass'n v. Harris,* 632 F.2d 1045, 1058 (3d Cir.1980)).

6. Milestone, Osser, Mele and Martin are collectively referred to as the "Defendants."

## B. *Procedural History*

This action is a consolidation of fifteen lawsuits. The Plaintiffs filed the Amended Complaint on 28 April 1999. In response to the Amended Complaint, Milestone submitted the motion to Dismiss. Because Plaintiffs included a footnote in their Opposition Brief requesting an opportunity to file yet another amended complaint if the motion to Dismiss was granted, a telephone conference among counsel took place on 27 January 2000 (the "27 January 2000 Conference").

During the 27 January 2000 Telephone Conference, the Plaintiffs were advised that if, after review of the Motion to Dismiss and the Moving and Reply Briefs, they wanted to again amend the Amended Complaint, they should so advise the court on 1 February 2000. *See* 27 January 2000 Telephone Conference. The Plaintiffs were advised that leave to again amend the Amended Complaint would be granted, if requested. *See id.* The Plaintiffs were also advised that if they declined the opportunity to amend the Amended Complaint and if the Motion to Dismiss was granted, no further opportunity to amend would be permitted. *See id.* By letter, dated 1 February 2000, (the "1 February 2000 Letter") counsel for Plaintiffs indicated to the court that Plaintiffs would not seek to further amend the Amended Complaint. *See* 1 February 2000 Letter; *see also Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir.2000).

Finally, at the request of the court, oral argument was scheduled for 2 March 2000 (the "2 March 2000 Oral Argument"). *See generally* 2 March 2000 Tr. At the conclusion of the 2 March 2000 Oral Argument, the parties were asked to submit additional legal memoranda regarding the allegations contained in paragraph 89(a)–(j) of the Amended Complaint. *See id.* at 86. Specifically, counsel were requested to submit such memoranda on or before 16 March 2000. *See id.* Counsel were further asked to submit reply memoranda on or before 22 March 2000. *See id.*

## C. *Background*

The Amended Complaint alleges the Defendants, in an effort to increase and maintain an artificially high market price for Milestone securities, violated Section 10(b) and Section 20(a) of the Exchange Act by failing to promptly disseminate accurate and truthful information in connection with the operations, business, products, markets, management, earnings and the present and future business prospects of Milestone. *See* Amended Complaint at ¶¶ 11–15. Specifically, the Amended Complaint alleges the Defendants manipulated the contents of various quarterly reports, SEC filings, press releases and presentations to security analysts pertaining to the viability of Milestone. *See id.* In this regard, the Amended Complaint further alleges the Defendants misrepresented the results of the operations of Milestone and concealed adverse material information regarding the finances and financial condition of Milestone. *See id.* It appears, however, upon review of the Amended Complaint and the transcript of the 2 March 2000 Oral Argument, that the securities fraud claims of the Plaintiffs center primarily on the failure to disclose options to certain consultants.

### 1. *The Statements Concerning Anesthetic Effect*

The Amended Complaint alleges the Defendants, beginning on 31 March 1997, issued materially false and misleading statements concerning the Wand which caused investors to purchase Milestone common stock at artificially inflated prices. *See id.* at ¶ 15, 21.

#### a. *The 31 December 1996 SEC Form 10–K*

The 31 December 1996 SEC Form 10–K, filed with the SEC on 31 March 1997, detailed the merits and clinical test results of the Wand. The Amended Complaint relied on the 31 December 1996 SEC Form 10–K which states:

The Wand more quickly anesthetizes by eliminating the need for preliminary pain blocking injections and the waiting time required to see if this injection has taken effect before further anesthetic injections. . . .

\* \* \* \* \* \*

Although many dentists sometimes give painless injections, it is almost impossible for them to do so regularly using conventional techniques. . . .

\* \* \* \* \* \*

A **pre-production prototype** of "The Wand (TM)" has been clinically tested on over 1,000 patients. Ninety-six percent of those tested report a "painless" or significantly less painful **procedure** than standard procedures.

*Id.* at ¶ 22 (quoting the 31 December 1996 SEC Form 10–K) (bolding added). Significantly, counsel for Plaintiffs conceded at oral argument that nothing in this statement was false. *See* 2 March 2000 Tr. at 44:14–25, 45:1–13 (The court: "If you turn to paragraph 22, please, is there anything in that [31 December 1996 SEC Form 10–K] statement that you quoted there, those three excerpts, that [was] false?" . . . Counsel: "The fact that they're saying that the [W]and anesthetizes. At that point in time." . . . The court: "It doesn't say that." . . . "The [W]and does not anesthesize, does it? It delivers, it's a delivery system." Counsel: "Yes, that's right." The court: "So the wand does not cause anesthesia in the area, it delivers the anesthesia." Counsel: "Right.")

### b. *The 1996 Annual Report*

In addition, the Amended Complaint further relied on the 1996 annual report (the "1996 Annual Report"), which was disseminated on or about 31 March 1997. The Plaintiffs quoted a portion of the 1996

Annual Report which contains a statement by Dr. Stanley F. Malamed ("Malamed.") [7]:

> Our primary research and finding—to put it in non-clinical terms—is that the vast majority of patients tested reported either a 'more comfortable,' or 'less painful' **injection experience** than any other local anesthetic **injection method** currently available. In the majority of test cases, the patient described the Wand as 'pain free.'

*Id.* at ¶ 23 (quoting the 1996 Annual Report in turn reporting Malamed) (bolding added). Again, counsel for Plaintiffs conceded at oral argument that nothing in this statement was false. *See* 2 March 2000 Tr. at 45:15–16 (The court: "All right. Paragraph 23, anything false in that?" Counsel: "No . . . .")

The Amended Complaint alleges these two statements were materially misleading when issued because Milestone failed to disclose that Malamed had not succeeded in using the Wand to anesthetize patients. *See id.* at ¶ 24. In this regard, the Amended Complaint alleges that on 20 May 1998, Osser, as quoted by *Bloomberg News,* admitted that at the time Malamed conducted his study, the Wand did not anesthetize patients: "[The Wand] was painless, but they didn't achieve anesthesia." *Id.* At oral argument, however, counsel conceded that Malamed did not test for anesthesia. *See* 2 March 2000 Tr. at 46:14–16 (The court: "To try to suggest that [ ] Malamed was testing for anesthesia is, frankly, false. He did not do that, did he?" Counsel: "No.")

### c. *The 4 April 1997 Press Release*

Milestone issued a press release on 4 April 1997, (the "4 April 1997 Press Release") over the *Business Wire* announcing its intention to introduce the Wand later in the year. *See id.* at ¶ 26. The Amended Complaint quoted from the 4 April 1997

---

**7.** On 14 April 1997, Malamed was appointed special technical advisor to Milestone. *See* Amended Complaint at ¶ 27. At all times relevant to the Class Period, Malamed was also the Chairman of the Anesthesia and Medicine Department at the University of Southern California ("USC") School of Dentistry. *See id.* at ¶ 23.

Press Release which in turn quoted Osser as stating:

> "In 'The Wand' **we are developing a product** which both our clinical and market research indicates will have a lasting impact on the medical and dental fields. Essentially, we now have the financing, the foundation product lines, the distribution and the management team in place to rapidly grow a large medical 'Milestone' proprietary medical and dental equipment and disposable products. We intend to grow quickly. In just this last year, we have come a long way."

*Id.* (quoting the 4 April 1997 Press Release). (bolding added). Again, counsel for Plaintiffs conceded at oral argument that there was nothing false or misleading in the above-quoted language. *See* 2 March 2000 Tr. at 46:18–20 (The court: "All right. Paragraph 26, is there anything wrong in that? I am talking about the quotation that you put in there." Counsel: "No.").

### d. *The 21 May 1997 Press Release*

Milestone issued a press release on 21 May 1997, over the *Business Wire*, announcing the USC School of Dentistry had proposed to use the Wand and offered to perform ongoing clinical research on any future dental products developed by Milestone. *See id.* at ¶ 28. The Amended Complaint relied on the 21 May 1997 Press Release which quoted T. Howard Landesman, Dean of the USC School of Dentistry, as stating:

> "**My initial observations** of the product are very positive and lead me to believe that the **injection device** could revolutionize the way **in which local anesthetic is administered** both in dentistry and medicine. Though **more human subjects research is still needed to prove product efficacy,** I would like the USC School of Dentistry to be the first school in the nation to use the Wand."

*Id.* (quoting 21 May 1997 Press Release) (bolding added). Again, counsel conceded that there was nothing about Landesman's

comments that was false. *See* 2 March 2000 Tr. at 46:24–47:3. (The Court: "Paragraph [28] is there anything about Landesman's comments that are quoted there that [were] false?" Counsel: "I don't believe so.")

### e. *The 11 August 1997 Press Release*

On or about 11 August 1997, Milestone reported its second quarter and six month results over the *Business Wire* (the "11 August 1997 Press Release"). *See id.* at ¶ 29. In addition, the 11 August 1997 Press Release announced the intention of Milestone to launch the Wand at the ADA convention between 18–21 October 1997. *See id.* The Amended Complaint quoted the 11 August 1997 Press Release which in turn quoted Osser as stating:

> "The results for the quarter and six months are as anticipated and reflect the substantial upfront costs in launching ... the Wand...."
>
> \* \* \* \* \* \*
>
> "We expect a good reception at our launch at the October 18–21, 1997 American Dental Association convention in Washington, DC and are optimistic that machine and disposable sales will grow rapidly after the introduction."

*Id.* (quoting the 11 August 1997 Press Release). Again, Counsel for Plaintiffs conceded at oral argument that nothing in this statement was false. *See* 2 March 2000 Tr. at 47:14–18 (The court: "Paragraph 29 in the quote at the last sentence, it talks about, 'We expect a good reception and are optimistic about machine and disposable sales.' Anything false about that?" Counsel: "No.").

The Amended Complaint alleges that because these press releases were made prior to tests indicating the Wand could anesthetize patients, they were misleading. The Amended Complaint, moreover, alleges the press releases successfully "hyped" the Wand, and as a result, Milestone common stock experienced a steady climb. *See id.* at ¶ 30.

The comments from Landesman point out that they were "initial observations" that the Wand "could revolutionize the way in which local anesthesia is administered." These comments were public and all would affect the market. The company pointed out that it was "developing" a product which "more quickly anesthetizes" and that a "pre-production prototype" was tested. The testing resulted in a "painless" or "significantly less painful" procedure in contrast to standard procedures. Milestone pointed out that the patients who were tested reported a "more comfortable" or "less painful" injection experience.

There is nothing in the Amended Complaint or the statements attributed to the company, as quoted in the Amended Complaint, which indicates that the Wand anesthetized patients rather than being the delivery procedure for it. It is clearly stated that the Wand is a delivery system.

### 2. The Options to Consultants and Related Statements

The Amended Complaint further alleges Milestone caused, *inter alia*, materially misleading statements, articles, reports and SEC filings to be disseminated regarding the "excitement" and, or, "acceptance" of the Wand among dental practitioners. *See id.* at ¶¶ 31–77.

For example, the Amended Complaint alleges Milestone privately entered into consulting agreements with various dental practitioners. *See id.* at ¶¶ 31–54. The Plaintiffs allege Milestone would compensate said consultants with stock options in return for subsequently published articles concerning the clinical success of the Wand. *See id.* It appears Milestone referenced these articles as evidence of the impending success of the Wand. The Amended Complaint, however, alleges the failure of Milestone to disclose that the authors of the favorable articles were compensated with stock options was materially misleading because the "studies ..., were in fact, bought and paid for promotional materials." *See id.* at ¶ 57. The Amended

Complaint further alleges Milestone common stock experienced significant gains in response to the favorable publications. *See e.g. id.* at ¶ 35.

During the 2 March 2000 Oral Argument, these articles were the subject of extended discussion. *See* 2 March 2000 Oral Argument at pp. 31–53. Significantly, counsel for Plaintiffs conceded that there was nothing in any of these articles that was false. *See id.* at 31:15–17. Moreover, counsel stated that there is neither reason nor basis to suggest that any or all of these authors conspired to do anything other than make fair statements in the articles so authored. *Id.* at pp. 18–23. In this regard, counsel conceded that in addition to the fact that there was nothing in any of the articles that is false, "there was nothing to suggest that any of these authors did anything, other than what they were suppose to do." *Id.* at 31:24–32:2.

Counsel for Plaintiffs conceded at oral argument that the Amended Complaint does not contain any factual basis for the allegation that the consultants authored "promotional materials." *See id.* 38:17–25, 39:1–2 (the court: "[S]how me one fact in this [Amended] [C]omplaint that substantiates that conclusory comment that these were not really studies, but, in fact, bought and paid for promotional materials." . . . . Counsel: "I don't think that there is a fact, your Honor."). With regard to the allegation that the studies were bought and paid for promotional materials, counsel for Plaintiffs stated: "[W]e don't have that information ... that they were hired to write promotional pieces." *See* 2 March 2000 Tr. at 33:21–23.

More to the point, in response to the question: "[D]o you have any facts to suggest that the studies done in these three articles that were in the New York State Dental Journal, Compendium on October, 1997 or Compendium, February, 1998 were not, in fact, studies but paid for promotional materials?" Counsel for Plaintiffs re-

sponded: "We allege no such fact." *Id.* at 53:15-20.

### a. The New York State Dental Journal Article

Mark Hochman ("Hochman"), an assistant professor at the State University of New York at Stony Brook School of Dental Medicine, authored a favorable article concerning the Wand that appeared in the August/September 1997 *New York State Dental Journal* ("NYSDJ") (the "NYSDJ Article"). *See id.* at ¶ 31. The NYSDJ Article described a fifty patient clinical study, involving a prototype of the Wand (the "Prototype"). It found the Prototype was "two to three times less painful than the manual injection." *See id.* (quoting the NYSDJ Article).

The Amended Complaint alleges the NYSDJ Article was materially misleading because it failed to disclose Hochman signed a consulting contract with Milestone on or before 26 July 1997. *See id.* at ¶ 32. Hochman received stock options to purchase 50,000 shares of Milestone common stock exercisable three to five years from the issue date. *See id.* Pursuant to the consulting contract, Hochman held the position of associate clinical director of Milestone. *See id.* at ¶ 31.

The Amended Complaint further alleges the receipt of stock options by Hochman and the failure to disclose his financial connection to Milestone in the NYSDJ Article rendered his judgment suspect. *See id.* at ¶ 32. In addition, the Amended Complaint alleges the failure of Hochman to disclose his connection to Milestone in the NYSDJ Article violated the publishing policy of NYSDJ requiring the disclosure of any financial, economic, or professional interest that may influence positions pre-

sented in articles published by the NYSDJ. *See id.* The Amended Complaint, moreover, alleges Milestone favorably referred to the NYSDJ Article in its 1997 annual report (the "1997 Annual Report"), attached to the 31 December 1997 SEC Form 10-K for the fiscal year ended 31 December 1997 (the "1997 SEC Form 10-K"), filed with the SEC on 31 March 1998. *See id.*

Significantly, counsel for Plaintiff stated at oral argument there was nothing in this NYSDJ article that was false. *See* 2 March 2000 Tr. at 49:19-21. (The court: "I again go back to the point that there is nothing in the article that's false, correct?" Counsel: "That's correct.")

### b. The 4 September 1997 Press Release

The 4 September 1997 press release (the "4 September 1997 Press Release") issued by Milestone over the *Business Wire* indicated that the USC School of Dentistry, "one of the largest dental schools in the nation," was purchasing the Wand for use by its dental students. The Amended Complaint relied on the 4 September 1997 Press Release which quoted Osser as stating: "We are very excited about the introduction of the Wand as it will have an enormous, positive effect on how practitioners administer local anesthesia." *Id.* at ¶ 33 (citing 4 September 1997 Press Release).

The Amended Complaint alleges the 4 September 1997 Press Release was materially misleading because the statement did not disclose Malamed, the chairman of the Anesthesia and Dentistry Department at the USC school of Dentistry, had a financial interest in Milestone in light of his earlier receipt of Milestone common stock options. *See id.* at ¶ 34.[8]

---

8. On 20 May 1998, a *Bloomberg Newswire* Article (the "20 May 1998 BNA") reported "Malamed 'played a role in the decision by USC Dental to purchase the Wand for use by its dental students.' Before Howard Landesman, Dean of USC's dental school, made such a decision, 'he sought the opinion of Malamed, who advised him to buy the devices.'

Landesman said he 'knew Malamed was associated with Milestone, but not that he received options.'" *Amended Complaint* at ¶ 34. (quoting the 20 May 1998 BNA). Significantly, the Amended Complaint does not allege that had Landesman known of the options Malamed received he would not have taken the advice from Malamed or would not

The Amended Complaint alleges that: "Landesman said he 'knew Malamed was associated with Milestone, but not that he had received options.'" Amended Complaint at ¶ 34. However, when counsel for Plaintiff was asked:

[I]s there anything that Malamed said to Landesman that was false or is there any indication from Landesman that had he known about the additional facts of the Malamed association with Milestone, including the option, he would not have taken Malamed's recommendation?

Counsel for Plaintiffs responded: "We don't say that, Your Honor." *Id.* at 50:10–16.

### c. The 1997 Compendium Article

Hochman and Mark Friedman ("Friedman"), an associate professor at the USC School of Dentistry and a Milestone clinical director, co-authored an article "praising the Wand." *See* Amended Complaint at ¶ 36. The article was published in the October 1997 issue of *Compendium* (the "1997 Compendium Article"), a journal published by Dental Learning Systems Co. The 1997 Compendium Article is alleged to have been materially misleading at the time it was published because neither the 1997 Compendium Article, nor Hochman nor Friedman disclosed the financial interests of Hochman and Friedman in Milestone. *See id.* at ¶ 37.

However, as previously indicated, counsel for Plaintiffs conceded that Plaintiffs asserted no facts or allegations that this article, or indeed any of the articles referenced in the Amended Complaint, were "paid-for" promotional materials. *See* 2 March 2000 Tr. 53:15–20; *Id.* at 38:17–39:2; *Id.* at 33:14–23; *Id.* 32:9–18.

### d. The 3 November 1997 Press Release

On 3 November 1997, Milestone reported over the *Business Wire* that in response to the introduction of the Wand at the ADA Conference, it had received nu-

merous orders for the Wand from full service dental dealers (the "3 November 1997 Press Release"). *See id.* at ¶¶ 38–41. The Amended Complaint quoted portions of the 3 November 1997 Press release:

[T]he Company has received orders for approximately 8,000 units for the Wand (TM) since its introduction on October 18th at the American Dental Association conference in Washington, DC.

\* \* \* \* \* \*

In addition to the disposables included in these orders, over 3,000 additional disposables have been ordered by Wand distributors including Henry Shein (Sullivan), Patterson Dental, Meer Dental and the American Dental Cooperative (ADC) Member Companies. These orders represent an aggregate total of over $5 million to the Company. Milestone expects to start fulfilling these orders in mid December. . . .

*Id.* at ¶ 41 (quoting the 3 November 1997 Press Release). Again, counsel for Plaintiffs conceded at oral argument that nothing in the quoted portions of the 3 November 1997 Press Release concerning distributors was false. *See* 2 March 2000 Tr. at 51:20–24, 52:1–3 (The court: "Paragraph 38, is there anything false about the reports of Milestone about their full-service dental dealers, Henry Shein, Paterson Dental, Mere Dental and American Dental Cooperative?" Counsel: "No." The court: "Paragraph 41 in the quote you have there, is there anything false in that?" Counsel: "No.").

In addition, the Amended Complaint cited to the 3 November 1997 Press Release which quoted Osser as stating:

"We are very excited over the reaction of dentists at the ADA conference. It only serves to further **our belief in how the Wand will advance the delivery of anesthesia** in dentistry. We are very pleased with the amount of orders we have for the Wand so far and expect

have purchased the Wand. Moreover, it is not alleged in the Amended Complaint that any-

thing that Malamed said to Landesman was false. *See* 2 March 2000 Tr. at 50:10–16.

even more orders in the ensuing months."

*Id.* at ¶ 42 (quoting the 3 November 1997 Press Release) (bolding added). Again, counsel for Plaintiffs conceded at oral argument that nothing in the above-quoted statement was false. *See* 2 March 2000 Tr. at 52:4–6 (The Court: "Paragraph 42 in the quote, is there anything false?" Counsel: "No.").

### e. *The 30 September 1997 SEC Form 10–Q*

On or about 14 November 1997, Milestone filed with the SEC the 30 September 1997 Form 10–Q.[9] *See* Amended Complaint at ¶ 44. The Amended Complaint quoted portions of the 30 September 1997 SEC Form 10–Q:

> Revenues for the three months ended September 30, 1997 were $670,896 compared to $47,471 for the same period a year ago. For the nine months ended September 30, 1997, revenues were $2,305,460 compared to $154,856.... The net loss for the quarter and nine months ended September 30, 1997 were $1,312,095, or $(0.23) per share on weighted average shares outstanding or 5,797,931 and $3,164,523 or $(0.16) per share on weighted average shares outstanding of 4,610,000 and $1,366,572 or $(0.30) per share on weighted average shares outstanding of 4,557,333 for the comparable periods a year earlier, respectively.

*Id.* at ¶ 44. (quoting the 30 September 1997 SEC Form 10–Q). Again, counsel for Plaintiffs conceded during oral argument that nothing in the above-quoted statement was false. *See* 2 March 2000 Tr. at 7–9 (The court: "Paragraph 44, is there anything in there that is false?" Counsel: "No.").

9. As mentioned, the 30 September 1997 SEC Form 10–Q, filed with the SEC, was signed by

### f. *The 17 November 1997 Press Release*

On 17 November 1997, Milestone reported over the *Business Wire* that since its introduction, the Wand has been met with tremendous excitement and acceptance (the "17 November 1997 Press Release"). *See* Amended Complaint at ¶ 45. The Amended Complaint relied on the 17 November 1997 Press Release which quoted Osser as stating:

> "As the company that just recently launched the Wand (TM), a revolutionary new approach to **giving 'painless' injections** in dentistry, the results to date, understandably, do not reflect the tremendous excitement and acceptance that the Wand (TM) has received. We are gratified by the enthusiastic endorsement of the Wand (TM) as evidenced by the 8000 orders valued at $5 million that were booked as a result of the recent American Dental Association convention in Washington, DC. **With ramp up of production under way and distributors arrangements in place with the leading distributors of dental equipment and supplies, we are looking forward to broad acceptance and usage of the Wand."**

*Id.* (quoting the 17 November 1997 Press Release) (bolding added). Again, counsel for Plaintiffs conceded at oral argument that nothing in this statement was false. *See* 2 March 2000 Tr. at 52:10–12 (The court: "Paragraph 45, anything in that quote that [was] false?" Counsel: "No.").

The Amended Complaint alleges the 30 September 1997 SEC Form 10–Q, 3 November 1997 Press Release and 17 November 1997 Press Release were materially misleading because Milestone "failed to disclose that a substantial amount of the 'excitement' and 'acceptance' generated about the Wand was a result of the articles written by consultants to whom Milestone awarded stock options and whose interests were thereby tainted."[10] Amended Complaint at ¶ 46.

Osser and Mele. *See* Amended Complaint at ¶ 44.

10. The Plaintiffs allege that based on the fa-

### g. *The 6 & 7 January 1998 Press Releases*

The Amended Complaint alleges that on or about 6 January 1998, Milestone issued a press release (the "6 January 1998 Press Release") over the *Business Wire* announcing Milestone had commenced shipment of the driver units of the Wand on 22 December 1997. *See id.* at ¶ 49. Again, Counsel for Plaintiffs conceded at oral argument that nothing in the quoted portion of the 6 January 1998 Press Release was false. *See* 2 March 2000 Tr. at 52:16–19 (The court: "Paragraph 49, anything in there that [was] false, the attribution you're giving to the company of the report over the business wire?" Counsel: "No.").

In addition, the Amended Complaint alleges that on 7 January 1998, Milestone issued another press release (the "7 January 1998 Press Release") over the *Business Wire* announcing Milestone common stock was accepted for trading on the NASDAQ under the symbol WAND. *See* Amended Complaint at ¶ 50.

The Plaintiffs relied on a portion of the 7 January 1998 Press Release which quoted Osser as stating:

"Trading on the NASDAQ National Market will provide our stockholders and prospective stockholders with easier access to market information about Milestone. Acceptance for trading on the NASDAQ National Market is also further recognition of the continued growth and development of Milestone."

*Id.* (quoting the 7 January 1998 Press Release). Again, counsel for Plaintiffs conceded at oral argument that nothing in the quoted portion of the 7 January 1998

Press Release was false. *See* 2 March 2000 Tr. at 52:20–22 (The court: "Paragraph 50, anything in there that [was] false?" Counsel: "No.").

### h. *The 19 February 1998 Press Release*

The Plaintiffs allege that on 19 February 1998, Milestone issued a press release (the "19 February 1998 Press Release") over the *Business Wire* indicating Milestone would exhibit the Wand at the Chicago Mid-winter Dental Conference beginning on 19 February 1998 and ending on 22 February 1998. *See* Amended Complaint at ¶ 51. The Plaintiffs relied, in part, on the 19 February 1998 Press Release which also contained significant financial data regarding Milestone:

To date, Milestone has received orders for over 11,000 units of the Wand of which over 2,700 have been shipped. In addition to the 1.1 million disposable [needles] included with these orders, 400,000 additional disposables have been shipped to Wand distributors including Sullivan–Shein, Patterson Dental, Meer Dental and the American Dental Cooperative (ADC) Member Companies.

\*　　\*　　\*　　\*　　\*　　\*

Milestone is adding additional manufacturing capacity in April, tripling capacity from 140,000 disposables per week to over 400,000 disposables per week. The Company expects to increase manufacturing capacity by the third quarter to over 5 million disposables per month. The reaction from dentists using the Wand is overwhelmingly positive.

*See id.* (quoting the 19 February 1998 Press Release). Again, counsel for Plain-

---

vorable financial forecasts issued by Milestone, on or about 18 November 1997, Medical Industry Today reported ("the 18 November 1997 MIT Report") the following: Marketed at $1,000 per unit and $1 for each disposable needle, Milestone estimates a $1.5 billion potential market for the Wand, according to earlier reports. The calculation is based on 475,000 dentists in the United States, Canada, European Union, Japan and Taiwan, each of whom aver-

ages 220 working days per year and 10 patient injections per day. The disposables alone would account for $1.05 billion. Amended Complaint at ¶ 48 (quoting the 18 November 1997 MIT Report). Again, Counsel for Plaintiffs conceded at oral argument that nothing in the quote from the 18 November 1997 MIT Report was false. *See* 2 March 2000 Tr. at 52:13–15 (The court: "Paragraph 48, is there anything in that quote which [was] false?" Counsel: "No.").

tiffs conceded at oral argument that nothing in the quoted portion of the 19 February 1998 Press Release was false. *See* 2 March 2000 Tr. at 52:23–24 (The court: "[Anything in Paragraph] Fifty-one [that was false]?" Counsel: "No.").

### i. *The 1998 Compendium Article*

In February 1998, Michael Krochak ("Krochak"), a director of the Dental Phobia Clinic at Mount Sinai Medical Center in New York City, authored an article appearing in the *Compendium* (the "1998 Compendium Article") and published by the NYSDJ, stating the Wand reduced patient anxiety. *See* Amended Complaint at ¶ 52. The Plaintiffs allege the 1998 Compendium Article was materially misleading when issued in February 1998 because Milestone did not disclose the options it granted to Krochak. *See id.* at ¶ 53.

Again, counsel for Plaintiffs conceded at oral argument that nothing in the quoted portion of the 1998 Compendium Article about the Wand reducing patient anxiety was false. *See* 2 March 2000 Tr. at 52:25, 53:1–3 (The court: "Paragraph 52, the comment by Krochak in his article stating that the [W]and would reduce patient anxiety, anything about that which [was] false?" Counsel: "No.").

### j. *The 30 March 1998 Press Release*

Milestone issued a press release on 30 March 1998 (the "30 March 1998 Press Release") over the *Business Wire* announcing its fourth quarter and year ended results for the period ended 31 December 1997. *See* Amended Complaint at ¶ 55. The 30 March 1998 Press Release contained significant financial data concerning Milestone:

> Its revenues, net loss and loss per share were $2,854,000, $7,438,000 and $1.21 in the year ended December 31, 1997 as compared to $302,000, $1,950,000 and $0.43 in the prior year. In the fourth quarter ended December 31, 1997 revenues, net loss and loss per share were $551,000, $4,262,000 and $0.52 as compared to $147,000, $582,000 and $0.13 in the prior year.

\* \* \* \* \* \*

> The principal reason for the increase in losses were costs associated with research and development in connection with the completion of the Wand(TM), marketing and personnel costs relating to the launch of the Wand(TM) and, to a lesser extent, the "SplaterFree" prophy angle and a non-cash charge in connection with the acquisition of the minority interest in Princeton PMC, a joint venture marketing affiliate established in 1996. After reflecting these losses, Milestone's financial position continues to be strong with more than $15,000,000 in cash, cash equivalents and treasury bills at year-end and virtually no debt.

\* \* \* \* \* \*

> Leonard Osser, Chairman and Chief Executive officer, stated "1997 represents a year of tremendous progress for the Company. Development work was completed on the Want(TM), the product was launched and marketing efforts commenced. Milestone also established distribution for the Wand(TM) through leading domestic distributors of dental products including Henry Shein (Sullivan), Patterson Dental, Meer Dental and the American Dental Cooperative (ADC) Member Companies. The Company is currently operating ahead of budget and on a profitable basis."

*Id.* (quoting the 30 March 1998 Press Release). Again, counsel for Plaintiffs conceded at oral argument that nothing in this statement on which they relied was false. *See* 2 March 2000 Tr. at 53:7–9 (The court: "Paragraph 55, there are three quoted paragraphs there. Anything false?" Counsel: "No.").

### k. *The 31 December 1997 SEC Form 10–K*

As mentioned, Milestone filed its 31 December 1997 Form 10–K, signed by Osser and Mele, with the SEC on 31 March 1998.

*See e.g.* Amended Complaint at ¶ 56. The Amended Complaint alleges the 31 December 1997 SEC Form 10–K reiterates the results previously announced in the 30 March 1998 Press Release. *See id.* The 31 December 1997 SEC Form 10–K states:

> The Company began shipping system kits consisting of the Wand(TM) driver unit, 100 disposable hand pieces, an instructional video tape and other instructional material in January 1998. Prior thereto pre-production prototype of the Wand(TM) had been clinically tested in over 1,000 patients.
>
> Ninety-six percent of those tested reported a **"painless" or significantly less painful procedure than standard procedures.** *Three separate additional studies were conducted on various aspects of the Wand(TM) operation. These have been published in major dental publications and have helped establish acceptance and credibility within the dental community.*

*Id.* (quoting the 31 December 1997 SEC Form 10–K) (emphasis in the Amended Complaint, bolding added). Significantly, Counsel for Plaintiffs conceded at oral argument that nothing in this statement was false. *See* 2 March 2000 Tr. at 53:10–12 (The court: "Paragraph 56 in the quoted paragraph, anything false?" Counsel: "No.").

The Amended Complaint, however, alleges the 31 December 1997 SEC Form 10–K and the 30 March 1998 Press Release were materially misleading because the "acceptance" and "credibility" referenced in the statements failed to disclose the studies which were so helpful to Milestone were actually "bought and paid for promotional materials." [11] *See* Amended Complaint at ¶ 57.

In addition, the 31 December 1997 SEC Form 10–K indicated Milestone retained the services of various consultants and compensated the consultants with Milestone stock options. *See id.* at ¶ 58. The Amended Complaint alleges the 31 December 1997 SEC Form 10–K stated:

> During 1996 and 1997, the **Company granted stock option to** a director and **various consultants** to purchase 35,000 and 164,000 shares of common stock, respectively, at prices ranging from $5.125 to $6.50 per share. The options expire in three to five years depending on the option, vest over two to three years and contain certain antidilution provisions.

*See id.* Again, counsel for Plaintiffs conceded at oral argument that nothing in this statement was false. *See* 2 March 2000 Tr. at 53:21–22 (The court: "Paragraph 58, anything false?" Counsel: "False, no.").

It is alleged the statements concerning the retention of consultants in exchange for stock options was materially misleading because the statements did not disclose Friedman, Hochman and Krochak were the individuals who received the Milestone common stock options. *See* Amended Complaint at ¶ 59.

### l. *The 4 May 1998 Press Release and 4 May 1998 Conference Call*

Milestone issued a press release on 4 May 1998 (the "4 May 1998 Press Release") over the *Business Wire* announcing its results for the first fiscal quarter ended 31 March 1998. *See id.* at ¶ 64. The 4 May 1998 Press Release stated:

> Revenues for the three months ended March 31, 1998 were $5,260,149 compared to $760,123 for the same period a year ago. The net income for the first quarter ended March 31, 1998 was $358,-079, or $0.04 per share on weighted av-

---

**11.** As mentioned, counsel for Plaintiffs conceded at oral argument that the Amended Complaint does not set forth any facts to support the conclusory allegation that the studies were actually "bought and paid for promotional materials." *See eg.* 2 March

2000 Tr. at 53:13–20 (The court: "... do you have any facts to suggest that the studies done in these three articles ... were not, in fact, studies but paid for promotional materials?" Counsel: "We allege no such fact.").

erage shares outstanding of 8,733,373, compared to a loss of $(696,028), or $(0.14) per share on weighted average shares outstanding of 4,840,527 for the comparable period a year earlier. During the first quarter of 1998 the Company delivered 7,311 Wand(TM) system kits to distributors and 817,000 disposable components. This represents net sales of $4,760,069 for the first three months of the fiscal year.

\* \* \* \* \* \*

The Company has a number of letters-of-intent from foreign distributors who are interested in bringing the Wand to the European, South American and Pacific Rim markets.

\* \* \* \* \* \*

Mr. Daniel R. Martin, President and COO of Milestone Scientific, said, "we are pleased with the demand and reorders from our distributors. The additional manufacturing capacity for the disposable units is in place and production levels are now at 2.5 million per month."

\* \* \* \* \* \*

Mr. Leonard A. Osser, Chairman and CEO of Milestone Scientific, noted, "the Wand's acceptance by the dental community has been extremely gratifying and resulted in the need to significantly increase our production capacity. Milestone now has in place the resources to assure the dentist of prompt delivery of his order. **The production ramp up has proceeded smoothly and by mid-year we expect to have in place the production capacity** to produce enough system kits and disposable components to satisfy our aggressive placement projections. The confidence that this revolutionary approach to painless dentistry will be an integral part of the dentist's practice in years to come."

*Id.* (quoting the 4 May 1998 Press Release) (bolding added). Again, counsel for Plaintiffs conceded at oral argument that nothing in this quote upon which Plaintiffs relied was false. *See* 2 March 2000 Tr. at 54:23–25, 54:1 (The court: "Paragraph 64, anything false in that quote? That's a long quote, it goes on to the next page." Counsel: "Right, no.").

Milestone also conducted a conference call on 4 May 1998 (the "4 May 1998 Conference Call") with investors to discuss first quarter results. *See* Amended Complaint at ¶ 65. It is alleged that during the 4 May 1998 Conference Call, Martin falsely represented the full 5,000 backlog of orders, placed as of 31 March 1998, had been shipped. *See id.* The Amended Complaint alleges this representation was false and misleading because the 5,000 backlog of orders had not been shipped and many of the previously placed orders had been cancelled. *See id.*

In addition, during the 4 May 1998 Conference Call, Milestone indicated sales to distributors would have been higher had Milestone been able to fill the back orders placed by those distributors. *See id.* The Amended Complaint alleges the statement regarding inventory was materially false and misleading because sales to distributors could not have been higher due to an actual "glut of inventory" rather than a low level of inventory on the part of the distributors. *See id.* at ¶ 66. The Amended Complaint further alleges the statement pertaining to inventory was materially false and misleading because Milestone was "aware or recklessly disregarded that dentists double and triple-ordered from various distributors in an effort to cut down the month-long wait it took to receive the product." *Id.*

Finally, during the 4 May 1998 Conference Call, Martin stated Milestone did not know the rate of returns for the Wand because it was "hard to keep track of returns to distributors." *See id.* (citing the 4 May 1998 Conference Call). Despite not knowing the total percentage of Wand returns, it is alleged Martin further stated that only approximately 200 Wands had been returned to Milestone in the first fiscal quarter. *See id.* In addition, the

Amended Complaint alleges Martin indicated Milestone had reserves for 10% of Wand returns and the reserves were carried as a reduction in revenue. *See id.* at ¶ 67. *See also* 2 March 2000 Tr. at 68:5–11 (The court: "Paragraph 67, second sentence, 'although he did not know the total percentage of returns, Defendant Martins stated that only approximately 200[W]ands had been returned to the company in the first quarter and of those, 25% were returned unopened,' anything false in that [sentence]?" Counsel: "In that sentence, no, Your Honor.")

### m. *The 4 June 1998 Press Release*

The Plaintiffs allege that on or about 4 June 1998, Harriot Tabuteau, an analyst for NationsBanc Montgomery Securities, changed a previous estimate for the sales and income loss of Milestone because distributor Henry Schein, Inc. reduced purchases for the Wand from 2,600 to 900 for the fiscal quarter ended 30 June 1998 (the "4 June 1998 Report"). *See* Amended Complaint at ¶ 69. The Amended Complaint also alleges the 4 June 1998 Report predicted a revenue shortfall of approximately $1 million dollars.[12] *See id.*

On or about 4 June 1998, Milestone issued a press release (the "4 June 1998 Press Release") over the *Business Wire* confirming Wand order cancellations would cost Milestone $1.2 million in sales. *See id.* The Amended Complaint alleges that in an attempt to soften the impact of the 4 June 1998 Report, Milestone issued the 4 June 1998 Press Release which quoted Martin as stating:

"Sullivan–Schein, Patterson Dental, Meer Dental and the American Dental Cooperative are promoting the Wand to their customers and have been publicly very positive about the product. In fact additional distributors have asked to distribute the Wand. We believe any delays

are short term and are not indicative of the eventual success of the Wand."

\* \* \* \* \* \*

"Milestone is now in the position of providing the Wand to distributors in a just-in-time fashion. This is the result of our success in ramping up the supply of Wand system kits and disposable components towards the end of the first quarter. Having product readily accessible from the Company allows distributors to maintain small stocks of product, while using Milestone's warehouse instead of their own."

*Id.* at ¶ 70 (quoting the 4 June 1998 Press Release). As mentioned, Counsel for Plaintiffs conceded at oral argument that the statements concerning the distributors were not false. *See* 2 March 2000 Tr. at 52:23–24 (The court: "[Anything in Paragraph] Fifty-one [that is false]?" Counsel: "No."). *See also id.* at 68:14–16 (The court: "We already covered Paragraph 70, didn't we? Is there anything false in 70?" Counsel: "I believe we covered it, Your Honor."); *See also id.* at 65:21–23 (The court: "Paragraph 70, is there anything wrong in that quoted paragraph?" Counsel: "No there isn't. . . .").

### n. *The 5 June 1998 Conference Call*

On 5 June 1998, Milestone conducted a conference call with investors to discuss the recent volatility of the pricing of Milestone common stock (the "5 June 1998 Conference Call"). *See* Amended Complaint at ¶ 71. During the 5 June 1998 Conference Call, Milestone stated it had shipped 2,600 units of the Wand by April 1998. *See id.* at ¶ 73. In addition, Milestone stated that as of May 1998, it had shipped an additional 1,100 units, for a total of 3,700 units rather than the full 5,000 backlog of orders as previously indicated during the 4 May 1998 Conference Call. *See id.* Finally, Milestone acknowledged its prior statements had "certainly contributed to investor confusion and mis-

---

**12.** The Plaintiffs allege that in response to the 4 June 1998 Report, Milestone shares dropped approximately 30%. *See* Amended Complaint at ¶ 69.

understanding." *Id.* (citing the 5 May 1998 Conference Call).

The Amended Complaint alleges the Defendants were "fully aware, or were reckless in failing to know" that Milestone had overstated acceptance of the Wand. *See id.* at ¶ 75. The Plaintiffs contend the Defendants were similarly "fully aware, or were reckless in failing to know" Milestone common stock was trading at inflated prices. Finally, the Amended Complaint alleges Defendants issued the allegedly false and misleading statements in order to maintain "substantial salaries, earn bonuses and long term compensation based upon the fictitious results they created." *See id.*

3. *The Asserted Violations of GAAP*

The Amended Complaint, moreover, alleges Milestone violated GAAP, and therefore filed materially false and misleading financial statements with the SEC for the fiscal first quarter ended 31 March 1998. *See generally id.* at ¶¶ 78–89.

a. *The 5 May 1998 SEC Form 10–Q*

On or about 5 May 1998, Milestone filed with the SEC its Form 10–Q for the first quarter ended 31 March 1998 (the "5 May SEC Form 10–Q"). *See id.* at ¶ 78. The Amended Complaint alleges the 5 May 1998 SEC Form 10–Q failed to disclose the reserve policy of Milestone for returns of the Wand. *See id.* at ¶ 79. In addition, the Plaintiffs allege, *inter alia,* because of the limited sales experience of Milestone and the limited time the Wand was available on the market, Milestone was required to disclose in the 31 March 1998 SEC Form 10–Q that the arbitrary 10% reserve figure used for the fiscal first quarter ended 31

March 1998, could not be relied upon for the fiscal second quarter ended 30 June 1998.[13] *See id.*

Specifically, the Amended Complaint alleges "SEC Regulation SX" requires all financial statements filed with the SEC conform with GAAP and financial statements not in conformity with GAAP are "presumed to be misleading or inaccurate." *See id.* at ¶ 83 (citing 17 C.F.R. § 210.401(a)(1)). In addition, the Amended Complaint alleges the Statements of Financial Accounting Standards No. 48 ("FAS 48"), issued by the Financial Accounting Standards Board, is encompassed in GAAP. *See id.* at ¶ 85. It appears FAS 48 governs the disclosure of revenue based on future returns of a product. FAS 48 states:

> If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at the time of sale only if all of the following conditions are met:
>
> f. The amount of future returns can be reasonably estimated.
>
> \* \* \* \* \* \*
>
> The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. However, the following factors may impair the ability to make a reasonable estimate:
>
> c. Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing cir-

---

**13.** Although beyond the Class Period, the Amended Complaint further asserts Milestone relied on the "materially false and misleading" 31 March 1998 SEC Form 10–Q in a press release, issued 18 August 1998, when Milestone announced the results for the fiscal second quarter and six months ended 30 June 1998 (the "18 August 1998 Press Release"). *See* Amended Complaint at ¶ 81. The 18 August 1998 Press Release stated:

> Coinciding with the initial launch of the Wand during the first quarter and through

the next month and a half of the second quarter, the Company maintained high levels of production and committed capital to increase production capacity. The product's early success was tempered by lower gross sales and higher returns through the remainder of the second quarter.... Therefore, the Company has provided reserves against sales sufficient to cover possible product returns ($928,000)....

(quoting the 18 August 1998 Press Release).

cumstances, for example, changes in the selling enterprise's marketing policies or relationships with its customers.

*Id.* at ¶ 86 (quoting ¶¶ 6 & 8 respectively, of FAS 48).

The Amended Complaint alleges Milestone violated FAS 48 and, therefore, violated GAAP by recognizing sales of the Wand system kits to distributors in the 31 March 1998 SEC Form 10–Q. *See id.* at ¶ 88. In this regard, the Plaintiffs allege Milestone admitted it could not predict the number of returns from Wand system kits shipped in the fiscal first quarter ended 31 March 1998. *See id.* In addition, Milestone did not have the "historical experience with similar types of sales" to make a reasonable estimate of future returns because shipment of the Wand began in or about January 1998, and ramp-up occurred in or about March 1998. *See id.* The Amended Complaint alleges the 31 March 1998 SEC Form 10–Q failed to "disclose that defendants had used a reserve for Wand returns of 10% and what the basis for that reserve was, and that the reserve would likely be insufficient for returns in the second quarter...." *Id.*

Finally, the Amended Complaint alleges that during the Class Period, the financial statements of Milestone violated the following principles of fair financial reporting:

(1) The principal that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (citing Financial Accounting Standards Board ("FASB") Concepts No. 1).

(2) The principle that financial reporting should provide information about an enterprise's financial performance during a period (citing FASB Statement of Concepts No. 1).

(3) The principle that financial reporting should be reliable in that it represents what it purports to represent (citing FASB Statement of Concepts 2).

(4) The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (*Id.*).

(5) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (*Id.*).

(6) The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the financial statements. (Accounting Principles Board Opinions ("APB"), Opinion No. 22).

(7) The principle that losses be accrued for when a loss contingency, then disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. (citing Statement of Financial Accounting Standards No. 5).

(8) The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (citing APB Opinion No. 28).

(9) The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (citing APB Opinion No. 28).

(10) The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

*Id.* at ¶ 89 (citing various principles of GAAP).

#### 4. The Asserted Misrepresentations, Omissions and Scienter

The Amended Complaint alleges the Defendants knew or recklessly disregarded the fact that the public documents and statements they issued on behalf of Milestone were materially false and misleading. *See id.* at ¶ 95. The Amended Complaint further alleges the Defendants knew or recklessly disregarded that public statements and, or, documents would be issued or disseminated to the investing public. *See id.* The Plaintiffs also contend the Defendants knowingly or recklessly participated in, or acquiesced, the issuance and, or, dissemination of said statements and, or, documents. *See id.*

In addition, the Amended Complaint alleges the Defendants had motive and opportunity to inflate the price of Milestone stock. For example, the Amended Complaint alleges Osser sold 500,000 shares of Milestone stock during the Class Period in excess of 5.3 million dollars. *See id.* at ¶ 91. In addition, following the completion of the financial statements for each year, commencing with 1998, Milestone would grant Osser an additional option to purchase up to 50,000 shares of Milestone common stock, in 10,000 share increments, for each $400,000 of net income in excess of $2,500,000. *See id.* at ¶ 92.

Finally, the Plaintiffs contend the Defendants knew or recklessly failed to know Milestone granted thousands of options to purchase Milestone common stock to practitioner consultants Friedman, Malamed, Hochman and Krochak. *See id.* at ¶ 94. The Amended Complaint further alleges the Defendants knew or recklessly failed to know the "reserve policy" set for the Wand returns would be inaccurate for the second quarter ended 30 June 1998.[14] *See id.*

#### Discussion

##### A. Standard For Dismissal Under Rule 12(b)(6), Rule 9(b) and 15 U.S.C. § 78u–4 et seq.

A court may dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1395 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

Because granting a motion under Rule 12(b)(6) can result in a dismissal at an early stage of a case, all allegations of a plaintiff must be taken as true and all reasonable factual inferences drawn in his or her favor. *See Gomez v. Toledo,* 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Weiner,* 129 F.3d at 315; *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir. 1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 279–80 (3d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278

---

**14.** The Amended Complaint also alleges the "statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the [allegedly] false forward-looking statements pleaded in this [Amended] Complaint." *See* Amended Complaint at ¶ 90. In this regard, The Plaintiffs contend the statements issued by Milestone during the Class Period were not "sufficiently identified as [ ] forward-looking statement[s]." *See id.* Alternatively, the Amended Complaint alleges any "false forward-looking statement" is not subject to the statutory safe harbor because at the time any statement was made during the Class Period, the speaker actually "knew the forward-looking statement was false...." *Id.*

(1992); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991); *Unger,* 928 F.2d at 1395; *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir. 1986).

■ A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom,* 848 F.2d at 401; *see also Shapiro,* 964 F.2d at 279–80. Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Haase v. Webster,* 807 F.2d 208, 215 (D.C.Cir.1986), *vacated on other grounds,* 835 F.2d 902 (D.C.Cir.1987); *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Bermingham v. Sony Corp. of Am.,* 820 F.Supp. 834, 846 (D.N.J.1992), *aff'd,* 37 F.3d 1485 (3d Cir.1994).

■ A District Court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *In re Burlington Coat Factory,* 114 F.3d at 1420; *Bermingham,* 820 F.Supp. at 846. Generally, when conducting such an inquiry, a District Court generally may not consider any material beyond the pleadings. *See In re Burlington Coat Factory,* 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196

(3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Wallace v. Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at *5 (E.D.Pa. Sept. 23, 1997); *Gannon v. Continental Ins. Co.,* 920 F.Supp. 566, 574 (D.N.J.1996).

■ A District Court, however, may properly refer to the factual allegations contained in other documents, such as documents referred to in the complaint and matters of public record if the claims in the complaint are based upon those documents. *See In re Burlington Coat Factory,* 114 F.3d at 1426; *In Re Westinghouse,* 90 F.3d 696, 707 (3d Cir.1996); *In re Donald Trump Casino Securities Litigation,* 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Pension Benefit Guar. Corp.,* 998 F.2d at 1196; *Wallace,* 1997 WL 602808, at *5; *Weiner,* 928 F.Supp. at 1380; *Gannon,* 920 F.Supp. at 574. In other words, such documents must be "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory,* 114 F.3d at 1426 (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)).

■ The reason for this rule is to prevent

> [t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*In re Burlington Coat Factory,* 114 F.3d at 1426. Under these circumstances, reference to documents outside of a complaint does not convert a motion to dismiss into a motion for summary judgment. *See In re Burlington Coat Factory,* 114 F.3d at 1426; *Pension Benefit Guar. Corp.,* 998 F.2d at 1196–97.[15]

**15.** Relying upon this exception, the following will be considered:

## B. *The Exchange Act*

In general, the Exchange Act regulates post-distribution trading. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). Together with the Securities Act, the Exchange Act "embrace[s] a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *See id.* (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)) (internal quotation marks omitted).

### 1. *The Exchange Act Claims*

#### a. *Section 10(b) and Rule 10b–5*

Count I of the Amended Complaint alleges violations of Section 10(b) and Rule 10b–5. *See* Amended Complaint at ¶¶ 96–104.

Through Section 10(b), Congress prohibits manipulative or deceptive acts in connection with the purchase or sale of securities. Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered,

any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j *et seq.*

Rule 10b–5, adopted by the SEC in 1942, similarly prohibits such fraudulent conduct in connection with the purchase or sale of a security. Rule 10b–5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1993).

To establish a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead (1) a false representation, or omission, of a material fact, (2) knowledge or reckless disregard of its falsity by a defendant and the intention that a plaintiff rely on the falsity, (3) reasonable reliance thereon by a plaintiff, and (4) a resultant loss. *See In re Advanta Sec. Litig.*, 180

1. The 31 December 1996 SEC Form 10–K
2. The 31 December 1997 SEC Form 10–K
3. The 1996 Annual Report
4. The 23 January 1997 Press Release
5. The 14 April 1997 Press Release
6. The 1997 *Compendium* Article
7. The October 1997 *Compendium* Article
8. The 1998 *Compendium* Article
9. The 4 September 1997 Press Release
10. The 1997 Annual Report
11. The Transcript of the 4 May 1998 Conference Call
12. The 20 May 1998 *Bloomberg News* Article
13. The Transcript of the 5 June 1998 Conference Call
14. The 5 May 1998 SEC Form 10–Q
15. The Osser Form 4 Statement of Changes of Beneficial Ownership

The above-referenced documents are attached, as Exs. 2–16, to the Siegel Affidavit. *See* Siegel Aff. ——

F.3d 525, 537 (3d Cir.1999); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 269 (3d Cir.1998); *Kline v. First Western Gov't Sec., Inc.*, 24 F.3d 480, 487 (3d Cir.), *cert. denied*, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992) (citation omitted); *Shapiro*, 964 F.2d at 280; *Lewis v. Chrysler Corp.*, 949 F.2d 644, 649 (3d Cir.1991) (citation omitted); *In re Phillips Petroleum*, 881 F.2d 1236, 1244 (3d Cir.1989); *Zlotnick*, 836 F.2d at 821 (citing *Peil v. Speiser*, 806 F.2d 1154, 1160 & n. 9 (3d Cir.1986) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.), *cert. denied sub nom. Wasserstrom v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985))).

The reliance of a plaintiff on alleged misstatements or omissions must be reasonable; the burden of proof is upon the defendant to show reliance was not reasonable. *See Kline*, 24 F.3d at 493 (citing *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (1976)). Where the security involved is traded in an open and efficient market, a plaintiff need not show individual and specific reliance on the misrepresentation of a defendant. A plaintiff may instead rely upon the fraud on the market theory and claim only that he or she suffered injury in the capacity as a purchaser or seller of a security in such a market.

" 'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.' " *See Cammer v. Bloom*, 711 F.Supp. 1264, 1276 (D.N.J.1989) (quoting *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). *See also Hayes*, 982 F.2d at 106.

In *Peil*, the Circuit held a showing of a fraud on the market may result in a rebuttable presumption of reliance by a plaintiff who purchases a security in an open and developed market. *See* 806 F.2d at 1161; *see also Zlotnick*, 836 F.2d at 821.

Where a purchaser of a stock establishes he or she made the purchase in an " 'open and developed market' " and the defendant had made a material misrepresentation, it " 'will [be] presume[d] that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock.' " *Zlotnick*, 836 F.2d at 821 (quoting *Peil*, 806 F.2d at 1161).

Because a Rule 10–5 claim is a "fraud" claim, a Section 10(b) plaintiff must satisfy the pleading requirements of Rule 9(b). *See In re Advanta*, 180 F.3d at 530–35; *In re Burlington*, 114 F.3d at 1417; *In Re Westinghouse*, 90 F.3d at 710; *Wallace*, 1997 WL 602808, at *8. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purpose of the heightened pleading requirement is to give defendants "notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory*, 114 F.3d at 1418.

In order to satisfy Rule 9(b) in connection with a Rule 10b–5 claim, a plaintiff must plead with particularity (1) a specific misrepresentation of material fact, (2) the knowledge by defendants of its falsity, (3) the ignorance by the plaintiff of its falsity, (4) the intention of defendants that it should be acted upon, and (5) that plaintiff acted upon it to his detriment. *See In Re Westinghouse*, 90 F.3d at 710; *Shapiro*, 964 F.2d at 284.

Consequently, Rule 9(b) demands increased specificity in the pleadings to establish violations of Section 10(b) and Rule 10b–5. Pursuant to Rule 9(b), allegations concerning misrepresentations of material fact must be pleaded in greater detail. *See, e.g., In re Burlington Coat Factory*, 114 F.3d at 1417–18 (Rule 9(b) requires "where plaintiffs allege that defendants

distorted certain data disclosed to the public by using unreasonable accounting practices, . . . plaintiffs [must] state what the unreasonable practices were and how they distorted the disclosed data"); *Shapiro*, 964 F.2d at 285 (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 646 (3d Cir.1989) (Rule 9(b) requires plaintiffs to "accompany the allegations with a statement of fact upon which their allegation is based")).

■ The particularity requirement of Rule 9(b) is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *See In re Burlington Coat Factory*, 114 F.3d at 1418; *Shapiro*, 964 F.2d at 285; *Craftmatic*, 890 F.2d at 645. This is so because application of the particularity requirement "may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Burlington Coat Factory*, 114 F.3d at 1418; *see Craftmatic*, 890 F.2d at 645; *Christidis v. First Pa. Mort. Trust*, 717 F.2d 96, 100 (3d Cir.1983).

■ Even under a relaxed application of Rule 9(b), "boilerplate and conclusory allegations will not suffice." *In re Burlington Coat Factory*, 114 F.3d at 1418; *see Shapiro*, 964 F.2d at 285. Instead, "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory*, 114 F.3d at 1418; *see Shapiro*, 964 F.2d at 285; *Craftmatic*, 890 F.2d at 645.

Complaints alleging securities fraud must also comply with the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4 *et seq. See In re Advanta*, 180 F.3d at 530; *In re Cendant Corp. Litig.*, 60 F.Supp.2d 354, 368–69 (D.N.J.1999). The PSLRA requires that a complaint, which asserts a Section 10(b) claim, must "state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (bolding added). This heightened scienter pleading

requirement mirrors that of the Second Circuit. *See In re Advanta*, 180 F.3d at 533 (noting the adoption of the Second Circuit heightened pleading requirement). *See also* H.R.Conf.Rep. No. 104–369, 104th Cong., 1st Sess. 41, 41 (1995), reprinted in 1995 U.S.C.C.A.N. 740, 740; S.Rep. 98, 104th Cong., 1st Sess. 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694.

■ As the Circuit recently announced: "Congress's use of the Second Circuit's language compels the conclusion that the [PSLRA] establishes a pleading standard approximately equal in stringency to that of the Second Circuit." *In re Advanta*, 180 F.3d at 534. To satisfy this pleading requirement, plaintiffs must state with particularity facts which show that defendants had both motive and opportunity to commit fraud or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See id.* (observing the PSLRA pleading standard "echoes precisely Fed.R.Civ.P. 9(b) and therefore requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story' ") (citations omitted); *In re Burlington Coat Factory*, 114 F.3d at 1418; *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

In connection with the PSLRA heightened pleading requirement concerning scienter, the Circuit stated:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind [scienter], the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind.

*In re Advanta*, 180 F.3d at 530 (quoting the PSLRA, 15 U.S.C. § 78u–4(b)(2)) (bolding added). By contrast, Rule 9(b) states "malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

The Circuit, however, has addressed the apparent conflict concluding: "Rule 9(b)'s provision allowing state of mind to be averred generally conflicts with the [PSLRA]'s requirement that plaintiffs 'state with particularity facts giving rise to a strong inference' of scienter. In that sense, we believe the [PSLRA] supersedes Rule 9(b) as it relates to Rule 10b–5 actions." *In re Advanta,* 180 F.3d at 531 & n. 5 (citing 15 U.S.C. § 78u–4(b)(2)).

■ In this regard, however, the Circuit cautioned that while the PSLRA "established a uniform pleading standard, it did not purport to alter the substantive contours of scienter." *Id.* at 534. Accordingly, "it remains sufficient for plaintiffs [to] plead scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute [strong] circumstantial evidence of either reckless or conscious behavior.'" *Id.* (quoting *Weiner,* 129 F.3d at 318, n. 8). In sum, motive and opportunity, like all other allegations of scienter, must now be supported by facts stated with particularity and must give rise to a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2). *See also In re Advanta,* 180 F.3d at 535.

■ Recklessness, in turn, involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta,* 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979)). Conscious behavior in this sense refers to "intentional fraud or other deliberate illegal behavior." *See id.*

Finally, pursuant to the PSLRA, certain forward-looking statements qualify for safe harbor treatment and are protected from Section 10(b) and Rule 10b–5 liability. *See* 15 U.S.C. § 78u–5. A "statement is for-

ward-looking if, *inter alia,* it is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" *In re Advanta,* 180 F.3d at 535 (quoting 15 U.S.C. § 78u–5(i)(1)(A)).

A forward-looking statement will *not* qualify for safe harbor treatment if the plaintiff proves the statement was made with "actual knowledge ... that the statement was false or misleading." *See* 15 U.S.C. § 78u–5(c)(1)(B)(i). *See also In re Advanta,* 180 F.3d at 535; *In re Cendant,* 60 F.Supp.2d at 375.

### C. *The Motion to Dismiss*

In support of the Motion to Dismiss the Defendants generally maintain:

> The relevant public filings, press statements and other statements, [ ] viewed in their totality and in context, ... were not false or misleading at the time made; did not cause the loss in value of Milestone's stock; are not pleaded with the required particularity; and/or are generalized opinions of future prospects, none of which are actionable under the federal securities law.

Moving Brief at 18.

In addition, the Defendants argue "there are no credible, particularized allegations that the Defendants acted with the requisite scienter sufficient to meet the heightened pleading standards of the [PSLRA]." *Id.* at 18–19 (citations omitted).

### 1. *The Asserted Undisclosed Options to Consultants*

As mentioned, the three articles at issue in the Amended Complaint are the NYSDJ Article, the 1997 Compendium Article, and the 1998 Compendium Article (collectively, the "Articles"). *See* Amended Complaint at ¶¶ 31–32; 36–37 & 52–53.[16] It appears

---

16. It appears the NYSDJ Article was the result of a joint effort by five separate dental practitioners. *See* NYSDJ Article, attached as Exhibit 7 to the Siegel Affidavit. As mentioned, Hochman, a Milestone consultant, was one of the authors. *See id.* The remaining

the Amended Complaint alleges the Articles were materially misleading because *some* of the authors of the Articles were Milestone consultants. *See id.* The Plaintiffs further contend Milestone disseminated materially misleading statements, reports, and SEC filings regarding these articles. *See e.g. id.* at ¶¶ 33–34, 38, 41–42, 44–46, 48–51, 54–62 & 64.

### a. *The Articles*

■ Defendants argued the allegations pertaining to the undisclosed Milestone stock options are entirely premised on "the assertion that somehow these otherwise **true** articles … became false because the options received by certain of the authors … were not disclosed." *See* Moving Brief at 24 (bolding added).

The Plaintiffs, however, argued it was materially misleading to use "testimonials" as a means to obtain acceptance and generate "excitement" for the Wand without disclosing the stock option payments to Milestone consultants. *See generally* Amended Complaint at ¶¶ 31–32; 36–37 & 52–53. *See also* Opposition Brief at 10–12.

■ For Rule 10b–5 liability to apply to a defendant, a plaintiff must meet his or her burden by demonstrating the loss in stock price was attributable to the alleged fraudulent conduct of the defendant. *See In Re Advanta,* 180 F.3d at 538. As mentioned, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, a complaint must "state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2).

It appears the Plaintiffs failed to allege, much more specify with particularity, how the Articles were materially false or misleading. *See* 15 U.S.C. § 78u–4(b)(1). For example, the Amended Complaint vaguely alleges Defendants "caused [Hochman] … to author [the NYSDJ] [A]rticle praising the Wand.…" *See* Amended Complaint at ¶ 31. As noted, the NYSDJ Article was authored by five dental practitioners. However, Hochman was the only author associated with Milestone. *See* NYSDJ Article, attached as Exhibit 7 to the Siegel Aff. Similarly, the Amended Complaint alleges, in a conclusory fashion, that the 1997 Compendium Article was materially misleading because "neither the [1997 Compendium Article] nor the [D]efendants disclosed that both Friedman and Hochman had financial interests in Milestone.…" *See* Amended Complaint at ¶ 37. The Plaintiffs, however, similarly failed to set forth facts supporting the allegation that the contents of the 1997 Compendium Article were either false or misleading.

As mentioned, counsel for Plaintiffs conceded at oral argument that none of the Articles contained any false or misleading statements. *See* 2 March 2000 Tr. at 31:13–17. Counsel for Plaintiffs, moreover, stated the Amended Complaint does not allege the authors published anything other than truthful findings regarding the Wand. *See id.* at 31:18–23. Counsel for Plaintiffs further stated the Amended Complaint does not contain any specific facts supporting the conclusory assertion that the authors were hired to publish "testimonials," and, or, promotional pieces. *See id.* at 32:3–18; 33:21–23.

four authors, however, were neither affiliated with, or received options from, Milestone. In addition, the 1997 Compendium Article was co-authored by Hochman and Friedman, another Milestone Consultant. *See* 1997 Compendium Article, attached as Exhibit 8 to the

Siegel Affidavit. The 1998 Compendium Article, moreover, was authored, in part, by Krockak, a third Milestone consultant. *See* 1998 Compendium Article, attached as Exhibit 9 to the Siegel Affidavit.

### b. *Milestone Statements and SEC Filings*

As mentioned, the Amended Complaint alleges Milestone disseminated various materially misleading statements and SEC filings detailing the favorable articles and, or, excitement surrounding the Wand. *See eg.* Amended Complaint at ¶¶ 33–34, 38, 41–42, 44–46, 48–51, 54–62 & 64.

■■■ For example, the Amended Complaint alleges the 4 September 1997 Press Release, in which Milestone reported the USC School of Dentistry ("one of the largest dental schools in the nation") was purchasing the Wand for use by its dental students, was materially misleading. *See id.* at ¶ 34. Specifically, the Amended Complaint alleges the 4 September 1997 Press Release was misleading because Milestone did not disclose that Malamed, who played a role in the decision by the USC School of Dentistry to purchase the Wand, was affiliated with both Milestone and the USC School of Dentistry. *See id.*

The Amended Complaint, however, fails to allege any facts in support of this conclusory allegation. *See In re Advanta,* 180 F.3d at 525. *See also Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at *9 (E.D.Pa. Sept. 23, 1997). For example, the Amended Complaint does not allege the decision by the USC School of Dentistry to purchase the Wand was premised on a fraudulent statement. Significantly, the Amended Complaint does not allege the USC School of Dentistry would not have purchased the Wand had it known Malamed received options from Milestone.[17] The Amended Complaint, moreover, does not allege Malamed engaged in any fraudulent conduct.

By contrast, counsel for Plaintiffs acknowledged at oral argument that Landesman was aware of the Malamed's involvement with Milestone. *See* 2 March 2000 Tr.

at 33:25, 34:1–3 (The court: "Malamed, he works at [the USC School of Dentistry]. His superior who authorized the purchase of the [W]and for [the USC School of Dentistry] knew he was a consultant or at least involved with Milestone?" Counsel: "Yes.").

In addition, counsel for Plaintiffs conceded at oral argument that the Amended Complaint does not allege the decision to purchase the Wand by USC was based on a fraudulent comment issued by Malamed. *See id.* at 34:8–11 (The court: "Do you allege any place ... that Landesman ... authorized the purchase and, or, use of the [W]and based solely upon a fraudulent comment...." Counsel: "No."). Finally, counsel for Plaintiffs conceded at oral argument that the Amended Complaint does not allege Landesman would not have purchased the Wand had he known of the options given to Malamed. *See id.* at 34:12–17 (The court: "Is there any place in the [Amended] Complaint you allege that [Landesman] would not have authorized this had he known more about Malamed?" Counsel: "... [T]he answer is no.").

The Amended Complaint further alleges the Defendants issued materially misleading statements concerning past sales, present earnings, and expected future sales performance of the Wand. *See* Amended Complaint at ¶¶ 41–42, 44–46, 48–49, 51, 55–59 & 64. The Plaintiffs argue these statements were materially misleading because Milestone had no reasonable basis for making such statements. *See* Opposition Brief at 24–26.

Specifically, the Plaintiffs argued the statements regarding the present "excitement" of the Wand and positive future projections were materially misleading because the Defendants "assured themselves of favorable research" through the payment of stock options to Milestone consultants.[18] *See* Opposition Brief at 26.

---

**17.** The Amended Complaint acknowledges that Landesman was aware Malamed was affiliated with Milestone.
*See* Amended Complaint at ¶ 34.

**18.** As mentioned, at oral argument counsel for the Plaintiffs stated the Amended Complaint does not allege any of the authors of the Articles were actually hired to compose

■ For example, the Amended Complaint alleges, *inter alia*, the 3 November 1997 Press Release and the 17 November 1997 Press Release were materially misleading. *See* Amended Complaint at ¶ 46.

The 3 November 1997 Press Release reported in relevant part:

[T]he Company has received orders for approximately 8,000 units for the Wand (TM) since its introduction on October 18th at the [ADA] conference in Washington, DC.

\* \* \* \* \* \*

In addition to the disposables included in these orders, over 3,000 additional disposables have been ordered by Wand distributors including Henry Shein (Sullivan), Patterson Dental, Meer Dental and the American Dental Cooperative (ADC) Member Companies. These orders represent an aggregate total of over $5 million to the Company. Milestone expects to start fulfilling these orders in mid December. . . .

\* \* \* \* \* \*

We are very excited over the reaction of dentists at the ADA conference. It only serves to further our belief in how the Wand will advance the delivery of anesthesia in dentistry. We are very pleased with the amount of orders we have for the Wand so far and expect even more orders in the ensuing months.

*Id.* at ¶¶ 41–42 (quoting the 3 November 1997 Press Release).

The 17 November 1997 Press Release similarly reported:

"As the company that just recently launched the Wand(TM), a revolutionary new approach to giving 'painless' injections in dentistry, the results to date, understandably, do not reflect the tremendous excitement and acceptance that the Wand(TM) has received. We are gratified by the enthusiastic endorse-

ment of the Wand(TM) as evidenced by the 8000 orders valued at $5 million that were booked as a result of the recent American Dental Association convention in Washington, DC. With ramp up of production under way and distributors arrangements in place with the leading distributors of dental equipment and supplies, we · are looking forward to broad acceptance and usage of the Wand."

*Id.* at ¶ 45 (quoting the 17 November 1997 Press Release).

■ It appears the 3 November 1997 Press Release and the 17 November 1997 Press Release primarily reported previous successes and express confidence in the prospects of Milestone for the near future. Factual recitations of past earnings, provided they are accurate, do not create liability under Federal securities laws. *See In re Advanta,* 180 F.3d at 538 (citing *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994)). *See also In re Burlington Coat Factory,* 114 F.3d at 1432 (citing *Convergent Technologies Sec. Litig.,* 948 F.2d 507, 513–14 (9th Cir. 1991)). Significantly, the Amended Complaint does not allege any portions of the reports, which detailed the past successes of Milestone, were inaccurate. As mentioned, counsel for Plaintiffs conceded at oral argument that none of the quoted passages from the 3 November 1997 Press Release or the 17 November 1997 Press Release contained false information. *See* 2 March 2000 Tr. at 52:1–10.

■ Furthermore, vague and general statements of optimism "constitute no more than 'puffery' and are understood by reasonable investors as such." *See In re Burlington Coat Factory,* 114 F.3d at 1428 n. 14. *See also In re Advanta,* 180 F.3d at 538–39 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *In re Craftmatic,* 890 F.2d at 642 (holding that "statements

"testimonials," and, or, promotional literature for Milestone. *See* 2 March 2000 Tr. at 32:14, 17–18. In addition, the Amended

Complaint does not allege the Articles contained any materially false or misleading statements and, or, information.

of subjective analysis or extrapolation such as opinions, motives, and intentions" are "soft information" and hence immaterial for purposes of Rule 10b–5)); *San Leandro Emergency Med. Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir.1996).

■ In the instant action, statements such as "we are very excited over the reactions of dentists . . .", *see* Amended Complaint at ¶ 41, "we are very pleased with the amount of orders we have for the Wand so far and expect even more orders in the ensuing months," *see id.* at ¶ 42, "the results to date, understandably, do not reflect the tremendous excitement and acceptance that the Wand has received," *see id.* at ¶ 45, and ". . . we are looking forward to broad acceptance and usage of the Wand," *see id.,* appear to be mere "puffery" or "soft information;" these statements do not give rise to a Federal securities claim. *In re Advanta*, 180 F.3d at 538. Even assuming these statements were misleading, the Amended Complaint fails to set forth any facts in support of the allegation that the 3 November 1997 Press Release and the 17 November 1997 Press Release were material. *See id.* (observing that "vague and general statements of optimism . . . even if arguably misleading, do not give rise to a [F]ederal securities claim because they are not material: there is no substantial likelihood that the disclosure of the omitted fact would have been view by the reasonable investor as having significantly altered the total mix of information made available.") (internal punctuation and citations omitted).

The 30 September 1997 SEC Form 10–Q, as quoted in the Amended Complaint, reported:

> Revenues for the three months ended September 30, 1997 were $670,896 compared to $47,471 for the same period a year ago. For the nine months ended September 30, 1997, revenues were $2,305,460 compared to $154,856. . . . The net loss for the quarter and nine months ended September 30, 1997 were $1,312,095, or $(0.23) per share on weighted average shares outstanding or 5,797,931 and $3,164,523 or $(0.16) per share on weighted average shares outstanding of 4,610,000 and $1,366,572 or $(0.30) per share on weighted average shares outstanding of 4,557,333 for the comparable periods a year earlier, respectively.

Amended Complaint at ¶ 44. (quoting the 30 September 1997 SEC Form 10–Q).[19] As mentioned, factual recitations of past earnings, provided they are accurate, do not create liability under Federal securities laws. *See In re Advanta*, 180 F.3d at 538 (citing *Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994)). *See also In re Burlington Coat Factory*, 114 F.3d at 1432 (citing *Convergent Technologies Sec. Litig.*, 948 F.2d 507, 513–14 (9th Cir. 1991)).

The Amended Complaint fails to allege any of the information contained in the 30 September 1997 SEC Form 10–Q was false and, or, inaccurate. The 30 September 1997 SEC Form 10–Q, therefore, cannot form the basis for liability under Section 10(b).[20] *See In re Advanta*, 180 F.3d at 538.

The Amended Complaint also alleges the 30 March 1998 Press Release, the 31 December 1997 SEC Form 10–K, and the 4 May 1998 Press Release were materially misleading. *See* Amended Complaint at ¶¶ 55–58, 64. Specifically, the Amended Complaint alleges these statements were misleading because they relied, *inter alia,* on the positive "paid for promotional mate-

---

**19.** The Plaintiffs allege the 30 September 1997 SEC Form 10–Q was materially misleading because it did not disclose the payment of options by Milestone to its consultants. *See* Amended Complaint at ¶ 46.

**20.** As mentioned, counsel for Plaintiffs conceded at oral argument that the statements from the 30 September 1997 SEC Form 10–Q were not false. *See* 2 March 2000 Tr. at 52:7–9.

rials" authored in part by Milestone consultants.[21]

The Amended Complaint fails to allege any facts supporting the conclusory allegation that the Articles cited in the 30 March 1998 Press Release, the 31 December 1997 SEC Form 10–K, and the 4 May 1998 Press Release were either false or materially misleading, much less that they were "promotional materials." *See* 15 U.S.C. § 78u–4(b)(1). As mentioned, counsel for Plaintiffs conceded at oral argument that none of the data in the Articles were either false or inaccurate. *See e.g.* 2 March 2000 Tr. at 31:17.

The "catch-all" conclusory allegation that various company issued statements were false or misleading because they relied, in part, on the Articles, therefore, does not meet the stringent pleading requirements established under the PSLRA. *See* 15 U.S.C. § 78u–4(b)(1). *See also In re Advanta*, 180 F.3d at 537–38 (observing the heightened pleading requirements set forth under the PSLRA). Importantly, the Amended Complaint does not set forth any additional facts to support the general allegation that the 30 March 1998 Press Release, the 31 December 1997 SEC Form 10–K, or the 4 May 1998 Press Release were either false or materially misleading.

### 2. The Asserted Lack of Anesthetic Effect

The Defendants argued the allegations concerning the lack of anesthetic effect were merely premised on the 20 May 1998 BNA, rather than on any false and, or, misleading statement. *See* Moving Brief at 22–23. Taken in context, however, the Defendants maintain "it is clear that Osser was referring only to Dr. Malamed's research to test whether the Wand was painless, not whether the patients were anesthetized through the use of the Wand." *Id.* at 22.

Defendants, moreover, argued "Dr. Malamed's report specifically stated that the 'first battery of clinical tests focused *solely* on patient comfort.'" *Id.* (emphasis in Moving Brief) (quoting 1996 Annual Report, attached as Exhibit 4 to the Siegel Aff.). Finally, the Defendants argued that all other statements in the record establish the Wand performs its intended function (it provides "a system that enables the dentist to more quickly and effectively anesthetize patients."). *See id.* at 23.

■ As mentioned, the Plaintiffs allege the 1996 Annual Report and the 31 December 1996 SEC Form 10–K, both filed with the SEC on 31 March 1997, were materially misleading when issued because Defendants failed to disclose Malamed had not succeeded in using the Wand to anesthetize patients. *See* Amended Complaint at ¶ 24. *See also* 2 March 2000 Tr. at 44–46.

The relevant portion of the 1996 Annual Report states:

In the case of Milestone's Wand, our first battery of clinical tests focused solely on the subject of patient comfort. Our first research assignment was to determine in a controlled setting **whether or not the Wand produced a 'more comfortable', or 'less painful' anesthetic injection experience** than any other injection technique currently available.

We have now tested the Wand local anesthetic device on more than 1,000 dental patients, and we have done so employing what is traditionally considered one of the more difficult and more painful dental **injection procedures** . . . .

Our primary research finding—to put it in non clinical terms—is that the vast **majority of patients tested reported either a 'more comfortable,' or 'less painful' injection experience** than any other local anesthetic injection method currently available. In the majority of test cases, **the patient described the**

---

**21.** As mentioned, Counsel for Plaintiffs conceded the Amended Complaint does not contain any facts to support the conclusory allegation that the Articles were "paid for promotional materials." *See e.g.* 2 March 2000 Tr. at 31:15–17.

Wand injection as 'pain free.' Only a small percentage reported the minor post operative awareness that an **injection had even been administered.**

As with most research, **we need to do more testing** now in order to render more detailed information on product capabilities and applicable procedures, but our initial findings indicate to our satisfaction that the Wand is what might well be termed a 'revolutionary' or 'milestone' new product—one that I believe dentists around the world could well be using in the very near future.

1996 Annual Report at 8, attached as Exhibit 4 to the Siegel Aff. (bolding added).[22]

Similarly, the 31 December 1996 SEC Form 10–K provides:

The Wand more quickly anesthetizes by **eliminating the need for preliminary pain blocking injections** and the waiting time required to see if this injection has taken effect before further anesthetic injections....

\* \* \* \* \* \*

Although many dentists sometimes give painless injections, it is almost impossible for them to do so regularly using conventional techniques....

\* \* \* \* \* \*

A pre-production prototype of "The Wand(TM)" has been clinically tested on over 1,000 patients. Ninety-six percent of those tested report a **"painless" or significantly less painful procedure** than standard procedures.

31 December 1996 SEC Form 10–K, attached as Exhibit 2 to the Siegel Aff. (bolding added).

■■■ "A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." *Wallace v. Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at *9 (E.D.Pa. Sept. 23 1997); *see In re Bell Atlantic Corp. Sec. Lit.,* No. 91–0514, 1997 WL 205709, at *23 (E.D.Pa. Apr. 17, 1997); *Pache v. Wallace,* No. 93–5164, 1995 WL 118457, at *3 (E.D.Pa. Mar. 20, 1995), *aff'd,* 72 F.3d 123 (3d Cir.1995). In addition, the law defines "material" information as "information that would be important to a reasonable investor in making his or her investment decision." *See In re Burlington Coat Factory,* 114 F.3d at 1425 (citing *In re Westinghouse,* 90 F.3d at 714).

It does not appear the 1996 Annual Report and, or, the 31 December 1996 SEC Form 10–K were factually inaccurate or materially misleading. Upon review of the Amended Complaint, moreover, it appears the Plaintiffs do not set forth any facts specifically describing how the above mentioned statements were false or misleading. Indeed, as mentioned, counsel for Plaintiffs conceded at oral argument that the statements quoted in paragraph 23 of the Amended Complaint (concerning the 1996 Annual Report) were not false. *See* 2 March 2000 Tr. at 45:16 (The court: "Anything false in 23?" Counsel: "No....").

In contrast to the conclusory allegations in the Amended Complaint concerning the initial testing of the Wand and the alleged lack of anesthetic effect, the Milestone reports indicated the initial tests of the Wand focused **solely** on patient comfort concerning the injection procedure. *See* 1996 Annual Report at 8, attached as Exhibit 4 to the Siegel Aff. In the Amended Complaint, however, it appears the Plaintiffs allege the initial testing conducted by Malamed centered on anesthesia. *See* Amended Complaint at ¶¶ 21–24. *See also* 2 March 2000 Tr. at 45:24–25; 46:1–16. These statements, however, described the Wand as a "revolutionary" **delivery system** which creates a less painful **procedure** for administering anesthesia. *See* 1996 Annual Report at 8, attached as Exhibit 4 to the Siegel Aff. *See also* 31 December

---

**22.** The 1996 Annual Report identifies Malamed as both the technology advisor to Milestone and Chairman of Anesthesia and Medicine at the USC School of Dentistry. *See* 1996 Annual Report at 8, attached as Exhibit 4 to the Siegel Aff.

1996 SEC Form 10–K, attached as Ex. 2 to the Siegel Aff.

The allegations contained in paragraphs 21–24 of the Amended Complaint, moreover, are belied by the Opposition Brief submitted on behalf of the Plaintiffs. In their brief, the Plaintiffs conceded (albeit in a footnote) the Wand successfully achieved anesthetic effect on patients. *See* Opposition Brief at 14, n. 5. Importantly, the Amended Complaint fails to reference, much more quote, any statement issued by Milestone in which the Defendants claimed the Wand, itself, anesthetized patients. As mentioned, the Amended Complaint fails to set forth any facts in support of the allegations that the 31 December 1996 SEC Form 10–K or the 1996 Annual Report were false or misleading. *See Wallace v. Systems & Computer Tech. Corp.*, No. 95–6303, 1997 WL 602808, at *9 (E.D.Pa. Sept. 23, 1997).

The Defendants also argued the allegations pertaining to the "launch of the Wand," *see* Amended Complaint at paragraphs 26 to 30, merely allege the Defendants "hyped" the Wand, rather than set forth with the required particularity how the statements were either false or misleading. *See* Moving Brief at 9. In addition the Defendants argued, *inter alia,* the Amended Complaint is "replete with attempts to craft securities fraud liability upon statements that are nothing more than generalized and optimistic statements." Moving Brief at 28–30.

In this regard, the Defendants argued many of the statements alleged to be materially false and, or, misleading are vague and "obvious hyperbole" upon which no reasonable investor would rely. *See id.* at 29. For example, the Defendants argued the allegations in paragraphs 26 and 28 of the Amended Complaint relate to "statements that at most are puffery or projections of future performance of the Wand, not worded as a guarantee." *See id.* at 30 (internal punctuation omitted).

Plaintiffs, however, vaguely argued there were numerous false and misleading statements that inflated the price of Milestone stock. *See* Opposition Brief at 23. Specifically, the Plaintiffs argued the statements contained in paragraphs 26 to 30 of the Amended Complaint are not mere "puffery" and are actionable because Defendants, *inter alia,* "had no reasonable belief that the Wand actually anesthetized dental patients." *See id.* at 26. However, as mentioned (and conceded by counsel for the Plaintiffs) the Wand is a delivery system; it does not itself anesthetize patients. *See* 2 March 2000 Tr. at 44:14–25; 45:1–13.

As mentioned, vague and general statements of optimism constitute no more than "puffery" and are understood by reasonable investors as such. *See In re Advanta,* 180 F.3d at 538 (observing vague and general statements of optimism, even if arguably misleading, do not give rise to a federal securities claim because they are not material). *See also In re Burlington Coat Factory,* 114 F.3d at 1427–28; *In re Donald J. Trump,* 7 F.3d 357, 369 n. 11 (3d Cir.1993) ("The term 'soft information' refers to statements of subjective analysis or extrapolation, such as opinion, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts.").

The 4 April 1997 Press Release stated:

"In 'The Wand' we are developing a product which both our clinical and market research indicates will have a lasting impact on the medical and dental fields. Essentially, we now have the financing, the foundation product lines, the distribution and the management team in place to rapidly grow a large medical 'Milestone' proprietary medical and dental equipment and disposable products. We intend to grow quickly. In just this last year, we have come a long way."

Amended Complaint at ¶ 26 (quoting 4 April 1997 Press Release). The Amended Complaint alleges the 4 April 1997 Press Release, among other statements, successfully "hyped" the wand. *See id.* at ¶ 30.

The conclusory allegation that the 4 April 1997 Press Release "successfully hyped the Wand" is not sufficient to meet the heightened pleading requirements of the PSLRA. *See* 15 U.S.C. § 78u–4(b)(1) (requiring plaintiffs to specify, *inter alia,* each statement alleged to have been misleading and the reason or reasons why the statement is misleading). *See San Leandro Emergency Med. Plan v. Philip Morris Co.,* 75 F.3d 801, 811 (2d Cir.1996) (puffery cannot misled the reasonable investor and cannot constitute actionable statements under the securities laws).

■■■ The 21 May 1997 Press Release, in which Milestone announced the USC School of Dentistry had proposed to use the Wand and offered to conduct ongoing clinical research, quoted T. Howard Landesman, Dean of the USC School of Dentistry, as stating:

> "My initial observations of the product are very positive and lead me to believe that **the injection device could revolutionize the way in which local anesthetic is administered** both in dentistry and medicine. Though more human subjects research is still needed to prove product efficacy, I would like the USC School of Dentistry to be the first school in the nation to use the Wand."

*See* Amended Complaint at ¶ 28 (quoting the 21 May 1997 Press Release) (bolding added).

The 11 August 1997 Press Release, moreover, stated in relevant part:

> We expect a good reception at our launch at the October 18–21, 1997[ADA] convention in Washington, DC and are optimistic that machine and disposable sales will grow rapidly after the introduction.

*Id.* at ¶ 29 (quoting 11 August 1997 Press Release).

The 21 May 1997 Press Release and 11 August 1997 Press Release are similarly comprised of "puffery" and presumably understood as such by the reasonable investor.[23] *See In re Advanta,* 180 F.3d at 539; *Gateway 2000, Inc.,* 122 F.3d at 547; *San Leandro Emergency Med. Plan,* 75 F.3d at 811. Statements such as: "my initial observations of the product are very positive and lead me to believe the injection device could revolutionize ...." and "We expect a good reception at our launch at the ADA convention ... [we] are optimistic that ... sales will grow rapidly ...." are general statements of optimism. *See In re Advanta,* F.3d at 538. Importantly, the Amended Complaint fails to allege there is a substantial likelihood that the contemporaneous disclosure of the Malamed affiliation with Milestone and the USC School of Dentistry would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *See id.* In this regard, the Amended Complaint fails to mention, much more allege the Plaintiffs would not have purchased Milestone stock had they known of the affiliation of Malamed with both Milestone and the USC School of Dentistry.

As mentioned, the above referenced statements are not actionable under the PSLRA; they are presumed to be understood as mere puffery by reasonable investors. *See In re Advanta,* 180 F.3d at 539. In addition, the Amended Complaint does not set forth how any of the above referenced statements were either false or misleading. Indeed, counsel for Plaintiffs indicated at oral argument that none of the above referenced statements actually contained any false or misleading information. *See generally,* 2 March 2000 Tr. at 46–47.

■■■ Finally, the Amended Complaint also fails to plead any facts supporting the single conclusory allegation that the Defendants "successfully hyped" the Wand through the issuance of these statements, and in turn artificially inflated the price of Milestone common stock. *See* 15 U.S.C.

---

**23.** At oral argument Counsel similarly indicated neither of the two statements was either false or misleading. *See* 2 March 2000 Tr. at 47:3,18.

§ 78u–4(b)(1). *See also Lower Merion Sch. Dist.,* 132 F.3d at 906. Importantly, the Amended Complaint fails to allege the failure to disclose options payments to consultants artificially inflated the price of Milestone stock. Indeed, Plaintiffs do not exclude the fact that during the Class Period Milestone stock simply tracked the general fluctuations of the stock market. Counsel for Plaintiffs, moreover, conceded at oral argument that the Amended Complaint does not allege that any non-disclosure resulted in an artificially inflated price for Milestone stock. *See* 2 March 2000 Tr. at 41:12–22 (The court: "Number one, there is nothing to suggest in this [Amended] Complaint that I can see that the failure to disclose the option situation artificially inflated the price.... Is there anything?" Counsel: "Nothing.").

### 3. *The Forward–Looking Statements*

The PSLRA establishes a safe harbor protecting certain forward-looking statements from Rule 10b–5 liability. *See* 15 U.S.C. § 78u–5. *See also In re Advanta,* 180 F.3d at 535. The PSLRA provides that forward-looking statements made by natural persons are shielded by the safe harbor provision unless a plaintiff proves it was made with "actual knowledge ... that the statement was false or misleading." *Id.* at 5(c)(1)(B)(i).

In addition, the PSLRA defines a statement as forward-looking if, *inter alia,* it is a "statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A).

The Amended Complaint vaguely alleges the forward-looking statements made by the Defendants were not subject to protection under the statutory safe harbor.[24] *See* Amended Complaint at ¶ 90. In addi-

tion, the Amended Complaint alleges to the extent certain statements are forward-looking, the statutory safe harbor does not apply because the Defendants had "actual knowledge" that the statements were false. *See id.* The Amended Complaint, however, fails to set out any factual basis for this conclusory allegation.

For example, The 19 February 1998 Press Release reported in part:

> Milestone is adding additional manufacturing capacity in April, tripling capacity from 140,000 disposables per week to over 400,000 disposables per week. The Company **expects** to increase manufacturing capacity by the third quarter to over 5 million disposables per month....

*Id.* at ¶ 51 (quoting the 19 February 1998 Press Release) (bolding added). It appears this portion of the 19 February 1998 Press Release is forward-looking because it is a "statement of the plans and objectives of management for future operations, including plans or objectives relating to the product or services of the issuer." *See* 15 U.S.C. § 78u–5(i)(1)(B). *See also In re Advanta,* 180 F.3d at 536 (determining that statements regarding plans to re-price customer accounts to increase revenue are forward-looking).

The Amended Complaint also alleges that "none of the forward-looking statements pleaded herein were sufficiently identified as a forward-looking statement...." *See id.* Pursuant to the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading...." *See* 15 U.S.C. § 78u–4(b)(1). *See also In re Advanta,* 180 F.3d at 538. Merely alleging the Defendants are liable for "any forward-looking statements pleaded ... [because] they were [not] sufficiently identified" as such does not meet the stringent pleading re-

---

24. In contrast to the specific pleading requirements established by the PSLRA, the Amended Complaint merely alleges: "The statutory safe harbor ... does not apply to any of the false forward-looking statements pleaded in th[e] [Amended] Complaint...." Amended Complaint at ¶ 90 (internal quotations omitted).

quirements of the PSLRA. *See Glassman, et al. v. Computervision Corp., et al.*, 90 F.3d 617, 628–30 (1st Cir.1996) (dismissing complaint because it was bereft of factual support). Notably, the Amended Complaint does not set out any factual support for this conclusory allegation.

■■■ As mentioned, the safe harbor will not apply if the statement was made with "actual knowledge" that the statement was false or misleading. *See* 15 U.S.C. § 78u–5(c)(1)(B)(i). In this regard, the Amended Complaint merely alleges the safe harbor does not apply to any of the statements pleaded because the "speaker actually knew the forward-looking statement[s] w[ere] false . . . ." *See* Amended Complaint at ¶ 90. The Amended Complaint, however, does not identify, much more allege, any facts to support the conclusory allegation that the Defendants had actual knowledge of the falsity of the forward-looking statements pleaded in the Amended Complaint. *See* 15 U.S.C. § 78u–5(c)(1)(B)(i). *See also In re Advanta*, 180 F.3d at 536 (holding that the "complaint does not plead any specific facts to support an inference that [the defendants] had actual knowledge of [the] statement's falsity."); *Computervision Corp*, 90 at 628–30. *Cf. In re Burlington Coat Factory*, 114 F.3d at 1428–30. (holding that unlinked factual allegations "do not suffice" to support a claim for securities fraud).

### 4. *The Asserted False Inventory and Backlog Statements*

The Defendants argued the Amended Complaint "seeks to base its Section 10(b) claims on statements made" during the 4 May 1998 Conference Call and 5 June 1998 Conference Call regarding inventory and backlog. *See* Moving Brief at 26–28, Reply Brief at 11. In particular, the Defen-

dants argued the Amended Complaint "simply misstates" the substance of the relevant comments made during the 4 May 1998 Conference Call regarding the backlog of orders placed for the Wand.[25] *See* Moving Brief at 27. The Defendants, moreover, argued the allegations pertaining to certain statements made concerning inventory and orders placed by dentists comprise an impermissible "fraud by hindsight claim." *See id.*

By contrast, the Plaintiffs asserted the statements offered during the 4 May 1998 Conference Call misled investors as to the level of demand and reorders from distributors. *See* Opposition Brief at 21. The Plaintiffs also argued the allegations regarding the 5 May 1998 Conference Call are not an impermissible "fraud by hindsight claim." *See id.* at 22. Specifically, the Plaintiffs argued they properly allege the Defendants had "contemporaneous knowledge of the true facts at the time the statements were made," sufficient to overcome any "fraud by hindsight" argument. *See id.*

#### a. *The 4 May 1998 Conference Call*

■■■ The Amended Complaint alleges that during the 4 May 1998 Conference Call, Martin represented, *inter alia*, that sales to distributors would have been higher had Milestone been able to fill back orders. *See* Amended Complaint at ¶ 65. The Amended Complaint alleges this statement was materially false and misleading because distributors actually had a "glut of inventory" rather than a depleted inventory (as evidenced by the cancellation of a purchase order by a major distributor one month after the 4 May 1998 Conference Call). *See id.* at ¶ 66. The Amended Complaint further alleges the statements concerning backlog and inventory were

---

**25.** The Amended Complaint alleges that during the 4 May 1998 Conference Call Martin "falsely represented that the full 5,000 backlog of orders as of March 31, 1998 had already been shipped." *See* Amended Complaint at ¶ 65. Upon review of the transcript of the 4 May 1998 Conference Call, however,

it is clear Martin stated with qualification: "I **think most** of the 5,000 [unit backlog] has been shipped since we made that announcement. We had a very significant sales month in April, at the end of April." *See* 4 May 1998 Conference Call Tr. at 12, attached as Exhibit 12 to the Siegel Aff. (bolding added).

materially false and misleading because the Defendants were aware of the double and triple-orders being placed with distributors by dentists. *See id.*[26]

■ "Fraud by hindsight" has been defined as the "attempt to impose liability on management for unrealized economic predictions." *See Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991); *Zucker v. Quasha*, 891 F.Supp. 1010, 1014 (D.N.J.), *aff'd* 82 F.3d 408 (3d Cir.1996). To be actionable, a statement or omission must be misleading at the time it was made. *See Zucker*, 891 F.Supp. at 1014. Liability cannot be imposed on the basis of subsequent events. *See id.* at 1016–17 (filing for bankruptcy four months after offering, could not be used to support claim corporation was in a precarious financial position at the time of the offering).

It appears the Plaintiffs seek to infer the existence of inventory problems at the time of the 4 May 1998 Conference Call from later occurrences. As mentioned, the Amended Complaint alleges the statements made during the 4 May 1998 Conference Call concerning inventory were

"materially false and misleading **when made** . . . because, instead of a low level of inventory, the Distributors had a glut of inventory as demonstrated just **one**

month later** when distributor Henry Schein Inc. cancelled a substantial portion of its purchase orders."

Amended Complaint at ¶ 66 (bolding added).

■ The Amended Complaint, moreover, alleges the statements "were also materially false and misleading because defendants were aware or recklessly disregarded that dentists double and triple-ordered from various distributors in an effort to cut down the month-long wait it took to receive the product." *Id.*

The Amended Complaint, however, does not set forth any facts to support the allegation that the Defendants were aware of, or recklessly disregarded, the "glut" of inventory on behalf of its distributors at the time of the 4 May 1998 Conference Call. *See Zucker*, 891 F.Supp. at 1014. Indeed, in support of the inventory allegation the Plaintiffs cite to a purchase-order cancellation which appears to have occurred (or at the least was announced)[27] one month after the 4 May 1998 Conference Call.[28] *See* Amended Complaint at ¶ 66. Importantly, the Amended Complaint does not set out any factual basis in support of the conclusory allegation that the Defendants knew distributors had a "glut of inventory." As mentioned, to be actionable, a statement or omission must

---

**26.** It appears due to the initial demand for the Wand and the inability of Milestone to fulfill purchase orders, dentists began double and triple-ordering the Wand from various distributors in an effort to combat the long delays in receipt by end users. *See* 5 June 1998 Conference Call at 5, attached as Exhibit 14 to the Siegel Aff.

**27.** Counsel for Plaintiffs indicated at oral argument that the Amended Complaint incorrectly alleges a substantial purchase-order was **cancelled** one month after the 4 May 1998 Conference Call. Rather, counsel for Plaintiffs asserted that the purchase-order cancellation was **announced** one month after the 4 May 1998 Conference Call. *See* 2 March 2000 Tr. at 64:3–12 (Counsel: "I apologize for this. There is a mistake in th[e] [Amended Complaint]. It should have been as announced one month later about [the distribu-

tor] because that was when the announcement was. The announcement was in June, but the fact occurred in May."). The Amended Complaint fails to allege exactly when this purchase-order cancellation actually took place.

**28.** It appears the Amended Complaint also relies upon the 4 June 1998 Report, in which an outside analyst lowered his projected estimates for sales and income (loss) for Milestone because a distributor reduced its purchase-orders for the 1998 second quarter ended 30 June 1998. *See* Amended Complaint at ¶ 69.

The 4 June 1998 Report, however, does not support the conclusory allegation that the Defendants were aware of this distributor cancellation at the time of the 4 May 1998 Conference Call. *See Zucker*, 891 F.Supp. at 1014.

be misleading at the time it was made. *See Zucker,* 891 F.Supp. at 1014.

The Amended Complaint merely alleges in a conclusory fashion, that "defendants were aware or recklessly disregarded" the fact that dentists double and triple ordered the Wand. The Amended Complaint, however, fails to set forth any facts to support this legal conclusion. *See In re Advanta,* 180 F.3d at 538 (stating that PSLRA requires plaintiffs to specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading).

A reckless statement, moreover, is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it." *Id.* at 534 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979)). The Amended Complaint does not mention, much more set forth with particularity, any facts to support the conclusory allegation that as of 4 May 1998, the statements by the Defendants concerning inventory constituted an "extreme departure from the standards of ordinary care." [29] *See id.*

b. *The 5 June 1998 Conference Call*

The Amended Complaint alleges during the 5 June 1998 Conference Call, Milestone "confirmed" the distributor purchase-order cancellation and "reiterated its contrived explanation that the reduction in standing purchase orders was a result of the Company's inability to ship on demand." *See* Amended Complaint at ¶ 71.

The Amended Complaint, however, fails to establish the requisite factual basis to support the conclusion that the "contrived explanation" was either false or misleading

at the time is was made. As mentioned, mere conclusory statements are not sufficient to form the basis for a securities fraud claim. *See* 15 U.S.C. § 78u–4(b)(1).

Specifically, during the 5 June 1998 Conference Call, Martin stated in relevant part:

"Cancellations ... When we got into a position, thanks to production ramp up, to ship orders immediately, [distributor] Schein decided to cancel th[e] old [Purchase Order] and then began to place new [Purchase Orders] on an as needed basis with [Milestone], since they [sic] no longer felt the need to protect their source of supply since we could now ship [on demand]."

5 June 1998 Conference Call at 5, attached as Exhibit 14 to the Siegel Aff.

Despite the conclusory allegation that the above referenced statement was materially false (significantly, the Amended Complaint does not cite, much more quote, any specific passages from the transcript of the 5 June 1998 Conference Call), the Amended Complaint fails to set forth how or why this statement was either false or misleading. Simply, the Amended Complaint does not provide any facts and, or, reason(s) why this statement was false. *See* 15 U.S.C. § 78u–4(b)(1).

In addition, the Amended Complaint does not set out any facts in support of the allegation that the "contrived explanation" was reckless. As mentioned, a reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it." *In re Advanta,* 180 F.3d at 534 (quoting *McLean v. Alexander,* 599

---

**29.** In addition, the Supreme Court has held acts constituting no more than internal corporate mismanagement are not actionable under the Federal securities laws. *See Santa Fe Indus. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (holding instanc-es of corporate mismanagement are inactionable in the context of Section 10(b)); *In re Craftmatic,* 890 F.2d 628, 637–40 (3d Cir. 1989) (applying *Santa Fe* to claims brought under Section 11 and Section 12(a)(2)).

F.2d 1190, 1197 (3d Cir.1979)). The Amended Complaint, however, does not properly allege the "contrived explanation" was an "extreme departure from the standards of ordinary care." *See id.*, 180 F.3d at 538. Significantly, the Amended Complaint does not set forth facts establishing when the Defendants knew of the double and triple-orders placed by dentists.

### 5. *The Asserted Violations of GAAP*

#### a. *The Asserted Material Misrepresentations*

The Defendants argued the allegations concerning revenue recognition and the 10% reserve estimate adopted by Milestone, *see* Amended Complaint at ¶¶ 79–89, fail to state a claim. The Defendants pointed out Plaintiffs, *inter alia*, have not specifically matched the allegations of improper revenue recognition with particular transactions, customer names, amounts, and dates of transactions. *See* Moving Brief at 30–32, Reply Brief at 8.

The Defendants also argued that at all times relevant to the Class Period, returns of the Wand never exceeded the 10% reserve estimate adopted by Milestone. *See id.* Moving Brief at 33, Reply Brief at 9. Defendants further argued the Amended Complaint improperly alleges the 5 May 1998 SEC Form 10–Q violated GAAP because it did not disclose the return policy and, or, the 10% reserve estimate implemented by Milestone. *See* Moving Brief at 14, Reply Brief at 10–11.

 The Amended Complaint vaguely alleges that "in the [5 May 1998 SEC Form 10–Q]," Milestone improperly recognized the "sale of the Wand system kits to its distributors." *See* Amended Complaint at ¶ 88. In addition, it appears the Amended Complaint alleges in a conclusory fashion that both the 5 May 1998 SEC Form 10–Q, and various statements elicited during the 4 May 1998 Conference Call were materially false or misleading because they failed to comment on the 10% reserve estimate adopted by Milestone. *See* Amended Complaint at ¶¶ 79 & 88.

The Amended Complaint relies, exclusively, on alleged violations of GAAP to support the allegation that the 5 May 1998 SEC Form 10–Q was materially false. *See* Amended Complaint at ¶¶ 80, 83–89.

For example, the Amended Complaint primarily relies upon accounting principles set forth in the FAS 48. *See* Amended Complaint at ¶¶ 85–88. FAS governs revenue recognition when the right of return exists for a product. *See id. See also* FAS 48 at ¶ 3 ("This statement specifies criteria for recognizing revenue on a sale in which a product may be returned, whether as a matter of contract or as a matter of existing practice, either by the ultimate customer or by a party who resells the product to others.").

Pursuant to FAS 48, if an entity sells its product but affords a buyer the right of return, revenue from the sales transaction shall be recognized at the time of sale only if all of the following conditions are met:

 a. The seller's price to the buyer is substantially fixed or determinable at the date of sale.

 b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

 c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

 d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

 e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

 f. The amount of future returns can be reasonably estimated.

*See* FAS 48 at ¶ 6.

"The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that [ ] vary from one case to the next."

*See id.* at ¶ 8. In this regard, FAS 48 establishes the following non-exhaustive list of four factors which may impair the ability of a seller to make a reasonable estimate of future returns:

"a. The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand.

b. Relatively long periods in which a particular product may be returned.

c. Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies or relationships with its customers.

d. Absence of a large volume of relatively homogeneous transactions."

*Id.* at ¶ 8.

As mentioned, these factors are illustrative of the types of factors to be considered in determining whether future returns can be reasonably estimated. *See id.* ("The existence of one or more of the above factors, in light of the significance of other factors, **may not** be sufficient to prevent making a reasonable estimate; likewise, other factors **may** preclude a reasonable estimate.") (bolding added).

It appears the Amended Complaint alleges Milestone violated FAS 48 because it recognized in its 5 May 1998 SEC Form 10–Q revenues for the sale of the Wand to distributors. *See* Amended Complaint at ¶ 88. The Amended Complaint further alleges that despite not having the requisite "historical experience with similar types of sales" Milestone failed to disclose, in the 5 May 1998 SEC Form 10–Q, that it used a reserve estimate of 10% and that that reserve "would likely be insufficient for re-

turns in the second quarter [ended 30 June 1998]." *Id.* The Plaintiffs, however, fail to set out a sufficient factual basis to support this conclusory allegation. *See* 15 U.S.C. § 78u–4(b)(1) (requiring plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . .").

As mentioned, FAS 48 applies to revenue recognition on a sale of a product in which the right of return is afforded the purchaser, whether as a matter of contract or as a matter of course. *See* FAS 48 at ¶ 3. The Amended Complaint, however, fails to allege whether the right of return for sales of the Wand was established in fact as either a matter of contract or practice.

The Amended Complaint alleges Milestone violated FAS 48 because future returns of the Wand could not have been reasonably estimated during the second quarter ended 30 June 1998. *See* Amended Complaint at ¶ 88. In support of this allegation, the Amended Complaint focuses on the apparent lack of historic experience of Milestone with similar sales of similar products. *See id.* As mentioned, the Plaintiffs contend that because Milestone lacked the requisite historical experience, revenue recognition for the second quarter ended 30 June 1998 was improper. *See id.*

As mentioned, pursuant to FAS 48, historical experience, or its absence, is but one factor to consider in determining whether future returns can be reasonably estimated (and revenue properly recognized). *See* FAS 48 at ¶¶ 6 & 8. In contrast to FAS 48, it appears the Amended Complaint merely alleges the lack of historical experience of Milestone is determinative of reasonableness.[30] *See* Amended Complaint at ¶ 79 & 88.

---

30. The Amended Complaint, however, alleges that "GAAP encompasses the rules, conventions and practices recognized and employed by the accounting profession for the preparation of financial statements. Statements of the Financial Accounting Standards Board . . . are among the highest authority of

GAAP." *See* Amended Complaint at ¶ 82. As mentioned, FAS 48 provides "the ability to make a reasonable estimate of future returns depends on many factors and circumstances that [ ] vary from one case to the next." FAS 48 at ¶ 8.

Indeed, certain statements made by Martin during the 4 May 1998 Conference Call appear to undercut the alleged relevancy of this factor.[31] For example, in explaining the reserve policy of Milestone, Martin stated:

> ... [R]eturns. **Now depending upon what assumptions we make at this early stage, and I repeat at "this early stage," returns can be calculated at anywhere from 3% to 10%. We won't know this number in a meaningful way until the end of th[e second quarter]**, but based on the positive comments received from dentists, our field sales force, and distributors, we don't see this as a source of concern. **It's within the industry average for new dental products,** and to be conservative, we've increased our reserve to 10% which we're quite comfortable with.

4 May 1998 Conference Call, attached as Exhibit 12 to the Siegel Aff. (bolding added).

■ Even assuming the reasonableness of estimated future returns could be evaluated by simply considering one factor (historical experience), the Amended Complaint does not allege the "conservative" 10% reserve estimate adopted by Milestone was not within the industry average for new dental products. In addition, the Amended Complaint does not allege the input received by Milestone from its sales force regarding estimated returns was unreliable, much more inaccurate. Finally, the Amended Complaint does not properly set forth any facts in support of the conclusion that the "conservative" 10% reserve estimate was in fact anything but conservative.[32] In light of the guidelines set forth in FAS 48, it appears the Plaintiffs

have not properly pleaded facts to support the conclusory allegation that Milestone recognized revenue in violation of FAS 48. *See generally* FAS 48.

### 6. *Scienter*

#### a. *The Asserted Lack of Anesthetic Effect and Undisclosed Options*

Pursuant to the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u–(4)(b)(1)–(2). As mentioned, the Circuit recently stated:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind [scienter], the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind.

*In re Advanta,* 180 F.3d at 530 (quoting the PSLRA, 15 U.S.C. § 78u–4(b)(2)) (bolding added).

Motive and opportunity, like all other allegations of scienter, must also be supported by facts stated with particularity and must give rise to a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2). *See also In re Advanta,* 180 F.3d at 535.

As explained, recklessness, in turn, involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the

---

Despite this acknowledgment, the Amended Complaint fails to mention, much more allege with particularity, the *many* factors which support the conclusory allegations that Milestone could not reasonably estimate future returns.

**31.** As mentioned, FAS 48 observes that the existence of one or more of the four enumerated factors, "in light of the significance of

other factors, may not be sufficient to prevent making a reasonable estimate...." FAS 48 at ¶ 8.

**32.** Indeed, the "mere failure to provide adequate reserves does not implicate the concerns of the [F]ederal securities laws and is not normally actionable." *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, at 281 (3d Cir.1992).

actor must have been aware of it." *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535 (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979)). Conscious behavior in this sense refers to "intentional fraud or other deliberate illegal behavior." *See id.*

It appears the Amended Complaint alleges the Defendants acted with the requisite scienter, *inter alia*, "because each of th[e] Defendants knew or recklessly disregarded the fact that the adverse facts specified [in the Amended Complaint] ha[ve] not been disclosed to, and were being concealed from, the public." *See* Amended Complaint at ¶ 12. The Plaintiffs also contend the "Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct ... in an effort to increase and maintain an artificially high market price for Milestone securities." *See id.* at ¶ 15. The Amended Complaint further alleges scienter can be inferred from the sale of stock by Osser during the Class Period. *See id.* at ¶¶ 91–93.

■■■■ "Pleading scienter may not rest on a bare inference that a defendant must have had knowledge of the facts." *In re Advanta*, 180 F.3d at 539 (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 26 (1st Cir.1992)) (internal quotations omitted). *See also In re Burlington Coat Factory*, 114 F.3d at 1421–22. "Likewise, allegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are inadequate to meet the PSLRA pleading standard. *See In re Advanta*, 180 F.3d at 539 (quoting *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998)). In addition, generalized imputations of knowledge do not suffice, regardless of the position of the defendant within the company. *See id.* (citing *Rosenbloom v. Adams, Scott & Conway, Inc.*, 552 F.2d 1336, 1338–39 (9th Cir.1977) ("A director,

officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information necessarily attaches to those positions.")).

Rather than state with particularity facts supporting a strong inference that Defendants possessed the requisite scienter, the Plaintiffs have offered only conclusory assertions that the Defendants acted "knowingly." *See* Amended Complaint at ¶¶ 12, 15, 94–95.[33] The Plaintiffs argued they have sufficiently pleaded scienter, *inter alia*, because they allege Defendants held back the truth about the Wand until after the 20 May 1998 Bloomberg Report. *See* Opposition Brief at 29.

As discussed, the Amended Complaint does not contain any facts to support the allegation that the Wand did not perform as the Defendants represented it did. As mentioned, the Wand is a delivery system, a system to reduce the pain of introducing local anesthesia. The Plaintiffs, moreover, conceded in their brief that the Wand actually achieved anesthesia. *See* Opposition Brief at 14, n. 5.

The Plaintiffs further argued that as a result of the non-disclosure of the options payments to consultants, Milestone stock continued to rise and trade at an artificially inflated price. *See* Opposition Brief at 30. Specifically, the Plaintiffs argued the materially false and misleading statements concerning options created a "snowball effect that resulted in an inflated stock price." *See id.* Importantly, the Amended Complaint does not set forth, much more plead with particularity, that any alleged non-disclosures created a "snowball effect." Indeed, the Plaintiffs merely allege the trading price of Milestone stock at various times during the Class Period. *See e.g.* Amended Complaint at ¶¶ 25, 30, 35 & 39.

**33.** In addition, the Amended Complaint contains blanket assertions that Defendants must have been aware of the alleged false and, or, misleading statements issued by Milestone by virtue of their positions within the company. *See* Amended Complaint at ¶¶ 13–14, 94.

### b. *Sale of Milestone Stock*

 The Amended Complaint alleges Osser "took advantage of Defendants' false and misleading statements by dumping 500,000 shares of the Company's stock during the Class Period." *Id.* at ¶ 91. In support of this conclusory allegation, the Amended Complaint further alleges facts regarding the employment agreement entered into between Osser and Milestone. *See id.* at ¶¶ 92–93.

The Third Circuit has held: "We will not infer fraudulent intent from the mere fact that some officers sold stock." *In re Burlington Coat Factory*, 114 F.3d at 1424. *See also San Leandro*, 75 F.3d at 814 ("[T]he sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent. . . ."). In addition, the Circuit has observed "[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows, then that these individuals will trade those securities in the normal course of events." *In re Burlington Coat Factory*, 114 F.3d at 1424.

 Fraudulent intent cannot be inferred from the mere fact that some officers sold stock. *See id. See also In re Advanta*, 180 F.3d at 541. If a complaint alleges the stock sales were unusual in scope or timing, however, the stock sales may support an inference of scienter. *See In re Burlington Coat Factory*, 114 F.3d at 1424.

The Plaintiffs have not sufficiently pleaded that the sale of stock by Osser permits an inference of scienter. For example, it appears Osser is the only individual defendant out of three individuals who sold Milestone stock during the Class Period. *See* Amended Complaint at ¶ 91. As mentioned, stock sales by some defendants during the Class Period do not give rise to an inference of scienter. *See In re Advanta*, 180 F.3d at 540 (noting that it was doubtful stock sales were motivated by an intent to profit from inflated prices because three individual defendants did not sell stock). *See also In re Burlington Coat Factory*, 114 F.3d at 1423 (stock sales do not permit an inference of scienter because only three of five defendants sold stock).

In addition, the Amended Complaint fails to mention, much more allege, the sales of stock by Osser were "unusual in scope or timing."[34] *See In re Advanta*, 180 F.3d at 540. *See also In re Burlington Coat Factory*, 114 F.3d at 1424. Indeed, it appears the allegations in the Amended Complaint confirm the notion that "[a] large number of today's corporate executives are compensated in terms of stock and stock options," *see* Amended Complaint at ¶¶ 92–93, and that "individuals will trade those securities in the normal course of events." *See In re Burlington Coat Factory*, 114 F.3d at 1424.

The Plaintiffs argued motive can be inferred from the "more than 5 million in profits" Osser realized from his sales of Milestone stock. *See* Opposition Brief at 30. Because the Amended Complaint fails to indicate the previous trading volume and, or, practices of Osser, it is difficult, if not suspect, to assign this number any significance. Although the profits realized by Osser were significant relative to [his] base salary, *see* Amended Complaint at ¶ 92, the proceeds were the result of accumulated stock options and were an intended part of his overall compensation package. *See id.* at ¶¶ 92–93. *See also In re Advanta*, 180 F.3d at 541.

---

**34.** Significantly, although the Amended Complaint fails to provide information regarding the total stock holdings of Osser, it appears the 500,000 shares of stock Osser "dump[ed]" during the Class Period amounted to a sale of approximately 10% of his total holdings. *See* 31 December 1996 SEC Form 10–K, attached as Exhibit 2 to the Siegel Aff. Osser, therefore, continued to retain a sizeable amount of Milestone stock. *See In re Advanta*, 180 F.3d at 540–41 (observing that a sale of 5% and 7% of corporate stock holdings amounts to a "small percentage.")

### c. The Asserted GAAP Violations

As mentioned, the Defendants argued the allegations concerning revenue recognition and the 10% reserve estimate adopted by Milestone, see Amended Complaint at ¶¶ 79–89, fail to state a claim. The Defendants contended Plaintiffs have not specifically matched the allegations of improper revenue recognition with particular transactions, customer names, amounts, and dates of transactions. See Moving Brief at 30–32, Reply Brief at 8.

The Plaintiffs, however, argued Milestone induced "various distributors to stock its new product ... with no way of knowing whether these distributors would actively attempt to market the new product.... Future returns, which the Company had no way of projecting, were wholly contingent upon events subsequent to the Company's shipment to its distributors, and matters which were outside of the Company's control." See Opposition Brief at 19. Plaintiffs further argued that "rather than disclose these material facts and upset the lofty price of the Company's stock, defendants falsely concealed their inability to accurately estimate future product returns...." See id. at 17.

■■■ "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." [35] Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir.1999) (quoting Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir.1996)). See also Greebel v. FTP Software, Inc., 194 F.3d 185, 203–04 (1st Cir.1999) ("violations of GAAP standards such as FAS 48 could provide evidence of scienter."); In re Software Toolworks Inc. Sec. Litig., 50 F.3d 615, 627 (9th Cir.1994); Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir.1994); In re Peritus Software Services, Inc. Sec. Litig., 52 F.Supp.2d 211, 223 (D.Mass.1999) (noting that "failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter.").

■■■ "To support even a reasonable inference of scienter, however, the complaint must describe the violation with sufficient particularity; a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation." FTP Software, 194 F.3d at 203 (quoting Gross v. Summa Four, Inc., 93 F.3d 987, 996 (1st Cir.1996) (internal punctuation omitted)).

At issue in FTP Software, was whether the allegations of the plaintiff regarding alleged violations of GAAP were pleaded with sufficient particularity to meet the pleading requirements for scienter. See id. The First Circuit, however, determined that the "complaint clearly [fell] short" [in establishing the requisite state of mind]. See id. at 204. The First Circuit noted the complaint failed to include "such basic details as the approximate amount by which revenues and earnings were overstated; the products involved in the contingent transactions; the dates of any of the transactions, or the identities of any of the customers or FTP employees involved in the transactions." [36] See id. (citations omitted). In light of the generality of the allegations, the Circuit determined that "it [was] possible to conclude FTP made some incorrect accounting decisions regarding a limited number of transactions; [but] seeing fraud, however, requires too great of an inferential leap." See id. at 206.

---

35. The "mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable." UJB Financial Corp., 964 F.2d at 281.

36. The First Circuit, however, observed that while "each of these particulars" need not appear in a complaint, "their complete absence in this case is indicative of the excessive generality of these allegations." See FTP Software, 194 F.3d at 204.

Even assuming the Plaintiffs have properly alleged violations of GAAP, the Amended Complaint fails to plead facts to support a *strong inference* that the Defendants possessed the requisite scienter.[37] *See Alias Research Inc.*, 174 F.3d at 84. *See also FTP Software, Inc.*, 194 F.3d at 203–04.

The Amended Complaint vaguely alleges that the 5 May 1998 SEC Form 10–Q was materially false and misleading in its failure to properly address the 10% reserve estimate. *See* Amended Complaint at ¶ 83.[38] The Plaintiffs, however, do not approximate, much more state with particularity, the amount by which revenues were overstated as a result of the alleged improper revenue recognition. *See FTP Software*, 194 F.3d at 204. The Amended Complaint also fails to identify any partic-ular sales that were improperly recognized as revenue. *See id.* In addition, the Amended Complaint does not allege any dates of transactions which contributed to the alleged violation of FAS 48.[39] *See id.*

The Amended Complaint further alleges the Defendants failed to disclose, both in the 4 May 1998 Conference Call and the 5 May 1998 SEC Form 10–Q, that the 10% reserve estimate could not be presumed to be adequate for returns in the second quarter ended 30 June 1998. *See* Amended Complaint at ¶ 79. The Amended Complaint, however, provides no factual support for this conclusory allegation. *See In re Burlington Coat Factory*, 114 F.3d at 1429. In this regard, the Amended Complaint fails to indicate whether the 10% reserve estimate was ever surpassed during the Class Period.[40]

37. The authority relied on by Plaintiffs in support of GAAP violations constituting a Rule 10–b claim is inapposite to the instant action. Plaintiffs cite *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir.1994) for the proposition that a violation of FAS 48 presumes a violation of Rule 10–b. *See* Opp. Brief at 19–20. Notably, *Malone* did not involve a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Indeed, by contrast to the assertions of the Plaintiffs, the Fourth Circuit noted that "in other circumstances, courts have discharged defendants from Rule 10–b liability notwithstanding deliberate violations of GAAP." *Id.* at 478 (citations omitted).

In *Malone*, moreover, the Fourth Circuit did not address whether the mere pleading of a FAS 48 violation, without more, properly stated a claim pursuant to Rule 10–b. Rather, at trial, an expert witness opined that the defendant repeatedly violated FAS 48. To that end, the expert witness detailed particular transactions and how they resulted in GAAP violations. *See Malone*, 26 F.3d at 478.

Further, as mentioned "allegations of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *See Alias Research*, 174 F.3d at 84. In *Alias Research*, the Second Circuit commented that "other courts, which apply a more lenient standard of pleading to securities fraud complaints, might well entertain the suit on [GAAP violations] alone." *See id.* at n. 3 (citing *Malone*, 26 F.3d 471, 478.). *See also In re Advanta*, 180 F.3d at 534 ("we believe Congress's use of the Second Circuit's language compels the conclusion that the [PLSRA] establishes a pleading standard approximately equal in stringency to that of the Second Circuit.")

38. The Amended Complaint also alleges in conclusory fashion that the 5 May 1998 SEC Form 10–Q was false because it "violated GAAP disclosure rules . . . contained false and materially misleading misrepresentations of fact . . . and failed to comply with GAAP." *See* Amended Complaint at ¶ 84.

39. As observed in *FTP Software*, these specific factors are not determinative of scienter; however, their complete absence exemplifies the impermissible. generality with which the allegations are pleaded.

40. The Plaintiffs rely upon *Epstein v. Itron, Inc.*, 993 F.Supp. 1314 (E.D.Wash.1998) for the proposition that because the Wand was the primary product of Milestone, it can be inferred that the Defendants were "at least reckless" in failing to disclose the accounting methods employed by Milestone. *See* Opp. Brief at 20. *See also* 2 March 2000 Tr. at 44:2–4. *Itron*, however, appears to be inapposite.

At issue in *Itron*, was whether a strong inference of scienter could be established by alleging that the primary product of a company was inherently incapable of performing its intended function. *See Itron*, 993 F.Supp. at 1325. The court determined: "If it is true . . . that Itron's core product is technologically incapable of meeting requirements that are central to Itron's continued survival as a business entity, it can be strongly inferred that key

As mentioned, the Amended Complaint further alleges the Defendants violated ten GAAP principles. *See* Amended Complaint at ¶ 89. As also mentioned, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *See Alias Research,* 174 F.3d at 84. *See also In re Advanta,* 180 F.3d at 534.

The Plaintiffs merely list ten GAAP principles in support of an alleged violation of Rule 10–b. In contrast to the heightened pleading requirements established by the PSLRA, the Amended Complaint simply alleges that "[b]ased upon the foregoing, the Company's financial statements during the Class Period were presented in a manner that violated the principles of ... GAAP." *See id.*

The alleged violations of FAS 48, in and of themselves, do not support a ·strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2). Similarly, the mere assertion that the Defendants violated various provisions of GAAP, without providing any specific factual support, cannot meet the pleading requirements under the PSLRA. *See* 15 U.S.C. § 78u–(4)(b)(1)–(2).

### 7. *The Asserted Violation of Section 20(a)*

The Amended Complaint alleges each of the individual Defendants, by virtue of, *inter alia,* their executive positions and stock ownership, were controlling persons and therefore violated Section 20(a). *See* Amended Complaint at 106–110.

 Section 20A(a) of the Exchange Act provides that an insider who trades stock "while in possession of material, non-public information" is liable to any person who traded contemporaneously with the insider. 15 U.S.C. § 78t–1(a). Liability

under section 20A(a) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." *Id.* Claims under section 20A(a), therefore, are derivative—requiring proof of a separate underlying violation of the Exchange Act. *See In re Advanta,* 180 F.3d at 541; *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir.1994) ("[T]o state a claim under [Section] 20A, a plaintiff must plead a predicate violation of the '34 Act [sic] or its rules and regulations."); *In re VeriFone Sec. Litig.,* 11 F.3d 865, 872 (9th Cir.1993) (noting that if plaintiffs "have failed to allege an actionable independent underlying violation of the '34 Act [sic], they similarly cannot maintain a claim under [Section] 20A").

Because plaintiffs have failed to plead a predicate violation of Section 10(b) or Rule 10b–5, the section 20(a) claim must be dismissed.

As mentioned, it appears the securities fraud claims pleaded in the Amended Complaint were actually based upon the 20 May 1998 BNA. The 20 May 1998 BNA reported that Milestone did not disclose to the investing public that it compensated various dental consultants with options. *See* 20 May 1998 BNA at 1, attached as Exhibit 13 to the Siegel Aff. In this regard, the 20 May 1998 BNA reported: "Stock options raise serious questions because their value its [sic] tied to the success of the company.... An undisclosed interest calls into question the authors' objectivity." *See id.* In response to the 20 May 1998 BNA, Milestone stock suffered a sharp decline. *See* Amended Complaint at ¶¶ 68–69.

It appears the report contained in the 20 May 1998 BNA did not report a complete picture of the Articles authored by the

---

officers like Humphreys had knowledge of this fact." *Id.*

It does not appear *Itron* is factually similar to the instant matter. As discussed above, Plaintiffs conceded that the Wand performed its intended function as a delivery system for anesthesia. *See* Opposition Brief at 14, n. 5.

The Amended Complaint, moreover, does not contain any facts supporting an inference that the Defendants knew or were reckless in not knowing that the Wand was "incapable of meeting requirements that were central" to the continued survival of Milestone as a business entity.

Milestone Consultants. Indeed, counsel for Plaintiffs conceded at oral argument that the Articles were neither false nor inaccurate nor bought and paid for promotional materials. Counsel for Plaintiffs, moreover, conceded that most, if not all, of the statements quoted in the Amended Complaint were not false. *See generally* 2 March 2000 Tr.[41] While the non-disclosure of the names of the consultants to whom options were granted may have been poor judgment, the Plaintiffs have not ade-

quately pleaded the basis to charge the Defendants with securities fraud.

*Conclusion*

For the reason set forth above, the Motion to Dismiss is granted.

41. As discussed, the allegations as pleaded in the Amended Complaint, do not meet the heightened pleading requirement of the PSLRA. Significantly, the Plaintiffs do not allege, nor did they argue in the Opposition Brief, that the heightened pleading require-ment of the PSLRA should be "relaxed" because relevant factual information was within the control of the Defendants. *See In re Burlington Coat Factory*, 114 F.3d at 1418. The Plaintiffs, moreover, did not allege the Defendants are "sophisticated defrauders." *See id.*